## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| HELIOS SOFTWARE, LLC and PEARL SOFTWARE, INC., | : |
| Plaintiffs, | : |
| v. | : C.A. No. 11-1259-LPS |
| AWARENESS TECHNOLOGIES, INC. and REMOTE COMPUTER OBSERVATION & MONITORING LLC (d/b/a REMOTECOM), | : |
| Defendants. | : |
| HELIOS SOFTWARE, LLC and PEARL SOFTWARE, INC., | : |
| Plaintiffs, | : |
| v. | : C.A. No. 12-081-LPS |
| SPECTORSOFT CORPORATION, | : |
| Defendant. | : |

---

Adam W. Poff, Esq., Monté T. Squire, Esq., Pilar G. Kraman, Robert M. Vrana, YOUNG, CONAWAY, STARGATT & TAYLOR LLP, Wilmington, DE.
Cabrach J. Connor, Jeffrey R. Johnson, REED & SCARDINO LLP, Austin, TX.
 Attorneys for Plaintiffs.

Rodger D. Smith II, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, DE.
Brian E. Moran, ROBINSON &COLE LLP, Stamford, CT.
 Attorneys for Defendants Awareness Technologies, Inc. and Remote Computer
 Observation & Monitoring LLC (d/b/a Remotecom).

Rex A. Donnelly, RATNER PRESTIA, Wilmington, DE.
James P. Martin, SHARTSIS FRIESE LLP, San Francisco, CA.
 Attorneys for Defendant Spectorsoft Corporation.

---

## MEMORANDUM OPINION

December 19, 2013
Wilmington, Delaware

**STARK, U.S. District Judge:**

Plaintiffs Helios Software, LLC and Pearl Software, Inc. ("Plaintiffs") filed a patent

infringement action against Defendants Awareness Technologies, Inc. and Remote Computer

Observation & Monitoring LLC (d/b/a Remotecom) (collectively "Awareness") on December 19,

2011. (C.A. No. 11-1259-LPS D.I. 1) Relatedly, Plaintiffs filed a patent infringement action

against Defendant Spectorsoft Corporation ("Spectorsoft" and, with Awareness, "Defendants")

on January 26, 2012. (C.A. No. 12-081-LPS D.I. 1) In both suits, Plaintiffs accuse Defendants

of infringing three U.S. Patents: Nos. 6,978,304 ("the '304 patent"), 7,634,571 ("the '571

patent"), and 7,958,237 ("the '237 patent") (collectively "the patents-in-suit").[1] The '304 and

'571 patents, which relate generally to remotely monitoring an internet session, are part of the

same family and share nearly identical specifications. The '237 patent is directed generally to

managing computer network access.

Pending before the Court is the issue of claim construction of various disputed terms of

the patents-in-suit. The parties completed briefing on claim construction on February 1, 2013.

(D.I. 85, 89; C.A. No. 11-1259-LPS D.I. 76, 78) In addition to the briefing, the parties submitted

technology tutorials (D.I. 72, 78) and expert reports (D.I. 260, 261, 275, 276). The Court held a

*Markman* hearing on February 15, 2013. (*See* D.I. 127) (hereinafter "Tr.").

---

[1]The '304 patent is entitled, "Method of remotely monitoring an internet session." It was issued on Dec. 20, 2005 and claims priority to May 26, 2000. It can be found in the record at D.I. 1 Ex. A. (All citations to the record are in C.A. No. 12-081 unless otherwise indicated.) The '571 patent is entitled, "Method of remotely monitoring an internet session." It was issued on Dec. 15, 2009 and claims priority to May 26, 2000. It can be found in the record at D.I. 1 Ex. B. The '237 patent is entitled, "Method for managing computer network access." It was issued on June 7, 2011 and claims priority to Jan. 23, 2001. It can be found in the record at C.A. No. 11-1259-LPS D.I. 1 Ex. C.

## I. LEGAL STANDARDS

"It is a bedrock principle of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (internal quotation marks omitted). Construing the claims of a patent presents a question of law. *See Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 977-78 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370, 388-90 (1996). "[T]here is no magic formula or catechism for conducting claim construction." *Phillips*, 415 F.3d at 1324. Instead, the court is free to attach the appropriate weight to appropriate sources "in light of the statutes and policies that inform patent law." *Id.*

"[T]he words of a claim are generally given their ordinary and customary meaning . . . [which is] the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Id.* at 1312-13 (internal citations and quotation marks omitted). "[T]he ordinary meaning of a claim term is its meaning to the ordinary artisan after reading the entire patent." *Id.* at 1321 (internal quotation marks omitted). The patent specification "is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996).

While "the claims themselves provide substantial guidance as to the meaning of particular claim terms," the context of the surrounding words of the claim also must be considered. *Phillips*, 415 F.3d at 1314. Furthermore, "[o]ther claims of the patent in question, both asserted and unasserted, can also be valuable sources of enlightenment . . . [b]ecause claim terms are normally used consistently throughout the patent . . . ." *Id.* (internal citation omitted).

2

It is likewise true that "[d]ifferences among claims can also be a useful guide . . . . For example, the presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim." *Id.* at 1314-15 (internal citation omitted). This "presumption is especially strong when the limitation in dispute is the only meaningful difference between an independent and dependent claim, and one party is urging that the limitation in the dependent claim should be read into the independent claim." *SunRace Roots Enter. Co., Ltd. v. SRAM Corp.*, 336 F.3d 1298, 1303 (Fed. Cir. 2003).

It is also possible that "the specification may reveal a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess. In such cases, the inventor's lexicography governs." *Phillips*, 415 F.3d at 1316. It bears emphasis that "[e]ven when the specification describes only a single embodiment, the claims of the patent will not be read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope using words or expressions of manifest exclusion or restriction." *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 906 (Fed. Cir. 2004) (internal quotation marks omitted), *aff'd*, 481 F.3d 1371 (Fed. Cir. 2007).

In addition to the specification, a court "should also consider the patent's prosecution history, if it is in evidence." *Markman*, 52 F.3d at 980. The prosecution history, which is "intrinsic evidence," "consists of the complete record of the proceedings before the PTO [Patent and Trademark Office] and includes the prior art cited during the examination of the patent." *Phillips*, 415 F.3d at 1317. "[T]he prosecution history can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would

3

otherwise be." *Id.*

A court also may rely on "extrinsic evidence," which "consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Markman*, 52 F.3d at 980. For instance, technical dictionaries can assist the court in determining the meaning of a term to those of skill in the relevant art because such dictionaries "endeavor to collect the accepted meanings of terms used in various fields of science and technology." *Phillips*, 415 F.3d at 1318. In addition, expert testimony can be useful "to ensure that the court's understanding of the technical aspects of the patent is consistent with that of a person of ordinary skill in the art, or to establish that a particular term in the patent or the prior art has a particular meaning in the pertinent field." *Id.* Nonetheless, courts must not lose sight of the fact that "expert reports and testimony [are] generated at the time of and for the purpose of litigation and thus can suffer from bias that is not present in intrinsic evidence." *Id.* Overall, while extrinsic evidence "may be useful" to the court, it is "less reliable" than intrinsic evidence, and its consideration "is unlikely to result in a reliable interpretation of patent claim scope unless considered in the context of the intrinsic evidence." *Id.* at 1318-19.

Finally, "[t]he construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction." *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998). It follows that "a claim interpretation that would exclude the inventor's device is rarely the correct interpretation." *Osram GmbH v. Int'l Trade Comm'n*, 505 F.3d 1351, 1358 (Fed. Cir. 2007).

4

## II.    CONSTRUCTION OF DISPUTED TERMS[2]

### A.    The '304 and '571 patents

####    1.    "Internet"

|  |  |
| --- | --- |
| **Plaintiffs' Proposed Construction** | No construction necessary; alternatively: "a global system of interconnected computer networks that exchange data using the standard Internet Protocol (IP)" |
| **Defendants' Proposed Construction** | "a global system of interconnected computer networks that exchange data using the Internet protocol suite" |
| **Court's Construction** | "a global system of interconnected computer networks that exchange data using the standard Internet Protocol (IP)" |

The principal issue in dispute is whether the term "internet" should be construed to cover

only public networks, as Defendants propose, or more broadly to cover any network that is

capable of connecting to the public internet – including private networks – as proposed by

Plaintiffs. The Court agrees with Plaintiffs that "internet" includes any network that is capable of

connecting to the public internet.

Defendants' position with respect to this term is inconsistent. First they contend that

"internet" should be given its plain and ordinary meaning. (D.I. 76 at 6) A few pages later,

however, Defendants claim that the term was specifically defined in the specification, and

therefore should be limited only to the public internet. (*Id.* at 8) In any event, the Court

disagrees with Defendants' assertion that the specification's recitation that "we have invented a

---

[2] The parties have agreed that the term "port," as used in claims 1 and 18 of the '304 patent, means "a number identifying a communication endpoint." (D.I. 85 at 27) The Court will adopt the parties' agreed upon definition of this term.

method of remotely monitoring an exchange of data . . . during an Internet session over the

Internet" ('304 patent, col. 1:38-41) limits "internet" to a purely public network. Defendants

have not identified any portion of the specification that provides a special definition or otherwise

evinces a clear intent to narrow the scope of the term "internet." *See generally Phillips*, 415 F.3d

at 1312-16 (stating words of claim should generally be construed in accordance with plain and

ordinary meaning, unless an exception applies) (internal citations omitted).

    **2.**    **"Internet protocol (IP) address," "IP address,"**
            **and "Internet server address"**

|  |  |
|---|---|
| **Plaintiffs' Proposed Construction** | "identifier of networked [server] computer or computers that communicate using an internet protocol" |
| **Defendants' Proposed Construction** | "a unique identifying number or unique domain name that distinguishes one computer [server] or group of computers [servers] on the Internet from all other computers on the Internet" |
| **Court's Construction** | "identifier of networked [server] computer or computers that communicate using an internet protocol" |

    The parties dispute whether the IP address must be a "unique" identifier, such that it

identifies a specific computer. Defendants propose that these "address" terms be narrowed while

Plaintiffs contend that nothing in the specification so limits the claim. Plaintiffs identify

examples of networks having an IP address which do not identify an individual computer on that

network. For example, Plaintiffs explain how a domain name can represent a collection of

computers (D.I. 73 at 7-8), or how a home network connected to a router could provide an IP

6

address that is shared by all devices connected to that router (*see* Tr. at 14-15).[3] By contrast,

Defendants fail to provide any intrinsic support for the requirement that the identifier must be

globally "unique."

### 3. "Internet session"

| | |
|---|---|
| **Plaintiffs' Proposed Construction** | No construction necessary; alternatively:<br><br>"transfer of content using an internet protocol" |
| **Defendants' Proposed Construction** | "a single continuous period of time during which two or more computers are connected and exchange data with each other over the Internet. A communication session between two or more computers over a local or private network does not constitute an Internet session, even if such computers can connect to the Internet." |
| **Court's Construction** | "a single continuous period of time during which two or more computers are connected and exchange data with each other using an internet protocol" |

Defendants contend that this term presents two disputes: "(1) whether the term is limited

to a communication session over the Internet between computers using TCP/IP; and (2) whether

a 'session' has a temporal component, with a defined beginning and end." (D.I. 76 at 9) The

Court has already resolved the first of these issues in connection with its construction of the term

"internet." The Court agrees with Plaintiffs that "wholly self-contained, private networks" are

not part of the "internet" while "private networks that are accessible" to the internet are part of

the "internet." (*See* Tr. at 57-61; *see also Skyline Software Sys., Inc. v. Keyhole, Inc.*, 2006 U.S.

Dist. LEXIS 83603, at *26-29 (D. Mass. Nov. 16, 2006) (construing "internet" as "[t]he publicly

---

[3] Plaintiffs provide substantial extrinsic evidence, including expert testimony, in support of their proposal as well. (*See, e.g.*, D.I. 89 at 5-7)

7

accessible network capable of relaying information via Internet Protocol, either alone or in conjunction with one or more other protocols, but not including a wholly self-contained private network of devices communicating only with each other"))

On the second issue, the Court agrees with Defendants that an "internet session" must have a temporal component, including a defined beginning and end. This conclusion is supported by the specification, which describes the invention as "a method for capturing the content of an ongoing Internet communication." ('304 patent, col. 1:28-30) Although Plaintiffs argue that "internet session" refers to "content" here, the Court agrees with the Defendants that "internet session" actually refers to "an ongoing Internet communication." (D.I. 76 at 9) The Court, thus, adopts part of the Defendants' construction without adopting Defendants' additional limitation that private networks that can access the internet are not part of the internet.

### 4.    "memory buffer"

| | |
|---|---|
| **Plaintiffs' Proposed Construction** | No construction necessary; alternatively: "a place where data is held temporarily" |
| **Defendants' Proposed Construction** | "place where data is held temporarily during the first Internet session prior to being saved to permanent storage for retrieval thereafter" |
| **Court's Construction** | "a place where data is held temporarily" |

By their construction, Defendants ask the Court to "clarify that data held in the memory buffer is not stored at the user computer *or available for retrieval after the termination of the first Internet session* unless such data is transferred to the monitor computer." (D.I. 76 at 12) Defendants' proposed construction would not accomplish this clarification. Instead, Defendants'

proposal would require that the data which is held temporarily in the memory buffer be saved permanently thereafter. This limitation is unsupported by the intrinsic record.

Plaintiffs' construction clarifies the plain and ordinary meaning of the term. During prosecution, the Examiner noted that "'buffers' are old and well known in the art. . . [They] are temporary storage. . . ." (D.I. 75 at JA0277) Contemporary dictionaries, which can be good sources for determining the ordinary meaning of a term, *see CCS Fitness v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed. Cir. 2002), also support Plaintiffs' construction. *See, e.g., Webster's New World Dictionary of Computer Terms* 78 (8th ed. 2000) (defining "buffer" as "[a] unit of memory given the task of holding information temporarily"). Hence, the Court will adopt Plaintiffs' proposed construction.

### 5. "monitor computer," "remote computer," "remote user computer"

|  | *monitor computer* |
|---|---|
| **Plaintiffs' Proposed Construction** | No construction necessary; alternatively: "a computer for monitoring data exchanged between a local user computer and remote computer" |
| **Defendants' Proposed Construction** | "a computer in a different geographic location than the local user computer and the remote computer that monitors data exchanged between the local user computer and the remote computer during the Internet session" |
| **Court's Construction** | "a computer for monitoring data exchanged between a local user computer and remote computer" |
|  | *remote computer/remote user computer* |
| **Plaintiffs' Proposed Construction** | No construction necessary; alternatively: "a different user computer" |

| Defendants' Proposed Construction | "a computer in a different geographic location than the local user computer and the monitor computer" |
|---|---|
| Court's Construction | "a different user computer" |

The parties' key dispute is whether the remote/monitor/remote user computers need to be in a different geographical location than the local user computer. Defendants suggest that if the applicants had wanted simply to identify different computers, they could have called them "First," "Second," and "Third" computers. (Tr. at 139) Because the applicants, instead, chose to call the computers "Remote," "Monitor," and "Local" computers and the invention is described as a method for remotely monitoring an internet session, these terms must mean something other than just "different" computers. (*See id.*)

Plaintiffs counter that just because an embodiment of the invention teaches a remote computer that is in a different geographic location does not mean that the claim is limited as well. *See Brookhill-Wilk 1, LLC v. Intuitive Surgical, Inc.*, 334 F.3d 1294, 1301 (Fed. Cir. 2003) ("[T]he fact that the inventor anticipated that the invention may be used in a particular manner does not limit the scope to that narrow context."). The Court does not read the intrinsic record as a whole as limiting the "monitor" and "remote" computers to being in a different geographical location from the local "user" computer. Therefore, the Court will adopt Plaintiffs' proposed constructions for these terms.

### 6. "request to monitor"

|  |  |
|---|---|
| Plaintiffs' Proposed Construction | No construction necessary. |

| Defendants' Proposed Construction | "a request, made by the user of the local user computer, for the monitor computer to begin monitoring data exchanged between the local user computer and the remote user computer during an Internet session" |
|---|---|
| Court's Construction | "a request for the monitor computer to begin monitoring data exchanged between the local user computer and the remote user computer during an internet session" |

The parties' dispute is essentially whether the "request to monitor" must be made by the user or whether the user computer may automatically make the request without an explicit request by a user. (D.I. 76 at 18; Tr. at 112-13) The specification does not support a requirement that the request to monitor must be sent by a user. ('304 patent, col. 6:26-32) ("Each request received by remote data display and log process via the second IP address causes remote data display and log process to *transmit to the requesting local data capture and forward process one of the unused third IP addresses . . . .*") (emphasis added) While rejecting Defendants' proposed additional limitation, the Court concludes that the remainder of Defendants' proposal accurately captures the plain and ordinary meaning of "request to monitor," given the Court's construction of other components of the proposed construction. Thus, the Court has adopted Defendants' construction but without the unsupported additional "user initiated" limitation.

### 7. "real-time transferring of data," "in real-time," "real-time data"

| | real-time transferring of data |
|---|---|
| **Plaintiffs' Proposed Construction** | No construction necessary; alternatively: |
| | *real-time transferring of data*: "transferring of data before events become obsolete, remote in time, or historical" |
| | *in real-time*: "before events become obsolete, remote in time, or historical" |
| | *real-time data*: "recent, not remote in time, data" |
| **Defendants' Proposed Construction** | *in real-time*: "instantaneously or without perceptible delay." |
| | Transferring data *in real-time* means that data is transferred substantially immediately as events occur and delivered to the recipient so that there is little or no perceptible delay. |
| | *real-time*: "instantaneous or without perceptible delay" |
| | *real-time data*: "data that is transferred instantaneously as external events occur" |
| | Receiving *real-time data* means that data transmitted from and received at the local user computer is received at the remote computer with little or no perceptible delay. |
| **Court's Construction** | *in real-time*: "instantaneously or without perceptible delay." |
| | Transferring data *in real-time* means that data is transferred substantially immediately as events occur and delivered to the recipient so that there is little or no perceptible delay. |
| | *real-time*: "instantaneous or without perceptible delay" |
| | *real-time data*: "data that is transferred instantaneously as external events occur" |
| | Receiving "*real-time data*" means that data transmitted from and received at the local user computer is received at the remote computer with little or no perceptible delay. |

The parties' primary dispute regarding these terms is whether data that has been cached or stored in memory, such as a session file, is real-time data. (D.I. 76 at 21; D.I. 89 at 18) According to Defendants, during prosecution the applicants expressly excluded from "real-time data" any data that has been cached or stored in memory. (D.I. 76 at 21) The Court agrees.

During prosecution of the '571 Patent, the PTO rejected claims 1 and 2 for lack of novelty in light of U.S. Patent No. 5,809,250 to Kisor. (D.I. 75 at JA0175) The applicants overcame that rejection by distinguishing Kisor based on Kisor's teaching that communicating a "session file" did not teach "transferring data in real-time." (*Id.*) The applicants defined "session file" as including "information from stored files, i.e. prerecorded files stored in a cache memory." (*Id.*) Moreover, when traversing a non-obviousness rejection over U.S. Patent No. 6,438,695 to Maufer, the applicants argued that Maufer only taught transmission of data in real-time. (*Id.* at 289) In that context, again, the applicants asserted that transmission of data in real-time is different from "storage of data prior to transmission of said data to destination and law enforcement computer." (*Id.*)

Plaintiffs argue that the '304 patent's specification discloses transmitting "a copy of all or part of the subsequent data associated with the first Internet session" in real-time. ('304 patent, col. 5:33-36) Further, Plaintiffs contend that "[i]n order to make and send a copy, the data was stored." (D.I. 89 at 19) But the specification does not state that sending a copy requires storing the data. More broadly, nothing in the specification alters the clear disavowal of claim scope the applicants made during prosecution. Accordingly, the Court will adopt Defendants' proposed constructions of the "real-time" terms.

### 8.    "time-stamp"

| | |
|---|---|
| **Plaintiffs' Proposed Construction** | No construction necessary; alternatively: "date and/or time associated with an event" |
| **Defendants' Proposed Construction** | "date and time associated with an event" |
| **Court's Construction** | "date and/or time associated with an event" |

The parties dispute whether a "time-stamp" requires both a date *and* time (Defendants'

position) or more broadly can consist of a date *and/or* time (Plaintiffs' position). The term

"time-stamp" appears in claim 14 of the '304 patent. That patent's specification discusses both a

date-stamp and a time-stamp. ('304 patent, col. 5:44-46, 57-59)  The Court finds no basis to

narrowly limit the scope of the claim to just those "stamps" that contain both dates and times.

### 9.    "user activation of an icon or key thereof"

| | |
|---|---|
| **Plaintiffs' Proposed Construction** | No construction necessary; alternatively: "[initiating a second Internet session in response to] user keystrokes or clicking a screen icon" |
| **Defendants' Proposed Construction** | "a person's clicking of one screen icon or pressing of one key of the user computer" |
| **Court's Construction** | "[initiating a second internet session in response to] user keystrokes or clicking a screen icon" |

The parties dispute whether user activation must be accomplished by use of a *single* icon

or *single* key or may be accomplished by any number of keystrokes or icons. Defendants take the

former position while Plaintiffs' advocate the latter.  As Defendants have not persuasively

14

identified a basis for their narrower construction, the Court will adopt Plaintiffs' proposal.

Defendants contend that "Plaintiffs impermissibly seek to broaden the claims to include automatic activation based on the content (*i.e.*, words and phrases) being typed by the user." (D.I. 76 at 17-18) Defendants find in the specification of the '571 patent a disclosure that, they contend, limits "user activation of an icon or key thereof" to activation by a single icon or single key:

> Emergency button icon can be activated by a user of local computer at anytime the user feels the content of the data associated with the first Internet session should be sent to monitor computer.

('571 patent, col. 4:39-43) (cited in D.I. 76 at 17) However, as Plaintiffs correctly point out, this disclosure simply provides that the "[e]mergency button icon can be activated by a user." (D.I. 89 at 21) The specification does not mention how such activation must occur. The Court agrees with the Plaintiffs that user activation does not need to be accomplished by use of a single icon or single key.

15

### B.     The '237 Patent

#### 1.     "access configuration," "control setting," "controlling"

| | |
|---|---|
| **Plaintiffs' Proposed Construction** | No construction necessary; alternatively:<br><br>***access configuration***: "rules for controlling access (allowing, blocking, monitoring, or recording client computer access)"<br><br>***control setting/controlling:*** "setting for allowing, blocking, monitoring, or recording access to network resources" |
| **Defendants' Proposed Construction** | ***access configuration***: "a file containing rules that define whether a client computer is permitted to connect to a network and exchange data with other computers on the network"<br><br>***control setting:*** "setting for allowing or blocking"<br><br>***controlling:*** "allowing or blocking" |
| **Court's Construction** | ***access configuration***: "rules for controlling access (allowing, blocking, monitoring, or recording client computer access)"<br><br>***control setting:*** "at least setting for allowing or blocking"<br><br>***controlling:*** "at least allowing or blocking" |

The parties dispute whether (1) the access configuration is a file; and (2) the access configuration must include rules for allowing or blocking the client computer's ability to connect to a network and exchange data with other computers on the network.

With respect to the first issue, Defendants point to the specification's disclosure of use of an "access configuration file." ('237 patent, col. 9:20-23) Based on this disclosure, Defendants propose to limit the term "access configuration" to a file. Plaintiffs point to several other parts of the specification where "access configuration" is not limited to being a file. ('237 patent, col.

16

4:27 ("access configuration is stored at the server computer"); 8:61-62 ("preferably, each access configuration includes all of the allow lists and block lists"); 7:47-49 ("update each list . . . cancel . . . without storing in the access configuration"). Nothing in the specification explicitly requires that the "access configuration" be provided in the form of a file. Moreover, the fact that the specification once uses the term "access configuration file" while the claim itself uses the term "access configuration" suggests that the latter, claimed term is broader than the term used in one place of the specification. The Court agrees with Plaintiffs that adding Defendants' proposed "file" limitation to the "access configuration" term would be improper.

Turning to the second issue, Defendants argue that the "control setting" and "controlling" terms must be capable of "allowing or blocking." (Tr. at 125) ("We're not saying there cannot be additional settings. We're saying that it has to include at least allowing or blocking.") Plaintiffs contend that "control setting" and "controlling" can also be accomplished by monitoring or recording access to network resources. (*Id.* at 124) ("[O]f course, there is allowing and blocking but there are other functions that [the control setting] controls.")

Defendants are correct in that the specification and the intrinsic evidence both limit "control setting" and "controlling" to require at least allowing or blocking. The specification teaches that an access configuration includes the "Allow all," "Allow listed," Block all" or "Block listed" settings. ('237 patent, col. 2:16-21) Further, during prosecution, the applicants noted that "[i]n the present invention, the client computer can attempt to access a specific IP address. Rules for this access attempt are checked . . . and a decision made . . . *to allow or deny access.*" (D.I. 75 at JA0428) (emphasis added) Plaintiffs, however, are correct that neither "control setting" nor "controlling" are limited to just allowing or blocking. (D.I. 73 at 23)

17

Hence, the Court will modify Defendants' proposed construction and make clear that these terms require at least allowing or blocking.

### 2.    "communication protocol"

| | |
|---|---|
| **Plaintiffs' Proposed Construction** | No construction necessary; alternatively: "standard for exchange of data between computers" |
| **Defendants' Proposed Construction** | "a standard for exchange of data between network computers" |
| **Court's Construction** | "standard for exchange of data between computers" |

Defendants would require that the data exchange occur only "between network computers," although they do not identify any intrinsic evidence to support such a "network" requirement. (*See* D.I. 76 at 30; D.I. 85 at 24) Plaintiffs respond that "[i]f computers are able to exchange data, they are networked." (D.I. 89 at 25) It appears, then, that there will be no dispute that the exchange is and must be occurring between networked computers. Hence, the Court concludes it need not add an express "network" limitation to the claim term. The Court will adopt Plaintiffs' alternative construction.

### 3.    "communication session"

| | |
|---|---|
| **Plaintiffs' Proposed Construction** | "transfer of data" |
| **Defendants' Proposed Construction** | "a single continuous period of time during which two or more computers on a network are connected and exchange data with each other" |
| **Court's Construction** | "a single continuous period of time during which two or more computers are connected and exchange data with each other" |

18

For substantially the same reasons as discussed under "internet session" and "communication protocol" above, the Court will largely adopt Defendants' proposed construction for the "communication session" term.  Plaintiffs argue that Defendants' construction would render claim steps meaningless, as Defendants' proposal would mean a session terminates when data has been exchanged, rendering the "terminating" step of Claim 7 superfluous.  (D.I. 73 at 25)  Defendants, however, have explained that their position is and "has always been that the 'session' is the period of time during which the computers are connected over the network, such that transfer of data is *possible*."  (D.I. 85 at 25) (emphasis added)  This clarification obviates Plaintiffs' concern.  Additionally, Defendants' construction is supported by intrinsic evidence.  (*See, e.g.*, '237 patent 1:60-64; 3:1; Claims 1, 8)  However, for the reasons discussed in connection with the "communication protocol" term above, the Court will not add an express "on a network" limitation to the claim term.

### 4.    "instantiating," "instantiated"

| | |
|---|---|
| **Plaintiffs' Proposed Construction** | No construction necessary; alternatively: <br><br> *instantiating on the client computer a process:* "instantiating (or starting) on the client computer a process" <br><br> *the process instantiated on the client*: "the process instantiated (or started) on the client . . ." |
| **Defendants' Proposed Construction** | Indefinite; alternatively: <br><br> *instantiating on the client computer a process*: "launching software on the client computer" <br><br> *the process instantiated on the client computer*: "the software launched on the client computer" |

19

| Court's Construction | *instantiating on the client computer a process:* "instantiating (or starting) on the client computer a process" |
|---|---|
| | *the process instantiated on the client:* "the process instantiated (or started) on the client . . ." |

Defendants contend that the "instantiating/instantiated" claim terms are indefinite under

35 U.S.C. § 112. The Court is not persuaded. *See generally Personalized User Model LLP v.*

*Google, Inc.*, 2012 WL 295048, at \*22 (D. Del. Jan. 25, 2012) (stating Court "does not permit

summary judgment arguments, including indefiniteness arguments, during the claim construction

phase of the litigation"). A claim term is sufficiently definite to be construed unless it is

"insolubly ambiguous." *Halliburton Energy Servs., Inc. v. M-I LLC*, 514 F.3d 1244, 1249-50

(Fed. Cir. 2008); *see also Pharmastem Therapeutics, Inc. v. Viacell, Inc.*, 2003 WL 124149, at \*1

n.1 (D. Del. Jan. 13, 2003). Defendant has failed to establish "by clear and convincing evidence

that a skilled artisan could not discern the boundaries of the claim based on the claim language,

the specification, and the prosecution history, as well as her knowledge of the relevant art area."

*Halliburton*, 514 F.3d at 1249-50.

Defendants' alternative proposed construction (i) limits the word "instantiating" to apply

only to software and (ii) distinguishes between "instantiating" and "initiating." The Court finds

nothing in the specification to support a conclusion restricting the term "instantiating" to

software. In fact, even the portion of the specification cited by Defendants recites that "[a]

*process* is instantiated on the client computer." (D.I. 76 at 26) (citing '237 patent, col. 3:2-3)

Similarly, the dictionary definition provided by Defendants does not restrict "instantiating" just

to software. (*See id.*) Defendants further argue that "instantiating" and "initiating" mean

different things – as "initiating" means "starting" while "instantiating" does not – but they

20

provide neither intrinsic nor extrinsic support for their contention.

Hence, the Court will adopt Plaintiffs' broader, alternative constructions, which are supported by the evidence and will be helpful to the jury.

### 5. "network address"

| | |
| --- | --- |
| **Plaintiffs' Proposed Construction** | "identifier used to locate one or more computers on a network" |
| **Defendants' Proposed Construction** | "an identifying number or name that distinguishes one computer or bank of computers on a network from other computers on the network" |
| **Court's Construction** | "identifier used to locate one or more computers on a network" |

This term presents essentially the same dispute the Court previously confronted with respect to the "IP address" term in connection with the '304 and '571 patents. For substantially the same reasons as discussed there, the Court likewise will adopt Plaintiffs' proposed construction of the "network address" term.

### III. CONCLUSION

The Court will construe the disputed claim terms of the patents-in-suit consistent with this Memorandum Opinion. An appropriate Order follows.

21