```
 1                    IN THE UNITED STATES DISTRICT COURT

 2                    IN AND FOR THE DISTRICT OF DELAWARE

 3                              - - -

 4   HELIOS SOFTWARE, LLC and PEARL      :     CIVIL ACTION
     SOFTWARE, INC.,                     :
 5                                       :
                 Plaintiffs,             :
 6   v                                   :
                                         :
 7   AWARENESS TECHNOLOGIES INC.,        :
     REMOTE COMPUTER OBSERVATION         :
 8   & MONITORING, LLC d/b/a REMOTECOM,  :
                                         :     NO. 11-1259-LPS
 9               Defendants.             :
                                 - - -

10
                            Wilmington, Delaware
11                       Thursday, February 26, 2015
                          Claim Construction Hearing
12
                                 - - -
13
     BEFORE:           HONORABLE LEONARD P. STARK, Chief Judge
14
                                 - - -
15    APPEARANCES:

16
               YOUNG CONAWAY STARGATT & TAYLOR, LLC
17             BY:  MONTE T. SQUIRE, ESQ.,
                    ROBERT M. VRANA, ESQ., and
18                  PILAR G. KRAMAN, ESQ.

19                  and

20             TAYLOR DUNHAM and RODRIGUEZ, LLP
               BY:  CABRACH J. CONNOR, ESQ., and
21                  JENNIFER TATUM LEE, ESQ.
                    (Austin, Texas)
22
                        Counsel for Helios Software, LLC and
23                      Pearl Software, Inc.

24

25                           Brian P. Gaffigan
                             Registered Merit Reporter
```

```
 1   APPEARANCES:   (Continued)

 2
                   PHILLIPS GOLDMAN & SPENCE, P.A.
 3                 BY:  MEGAN C. HANEY, ESQ.

 4                       and

 5                 ROBINSON & COLE, LLP
                   BY:  BRIAN E. MORAN, ESQ., and
 6                       THOMAS J. DONLON, ESQ.
                         (Stamford, Connecticut)
 7
                           Counsel for Awareness Technologies Inc.
 8                         and Remote Computer Observation &
                           Monitoring LC d/b/a RemoteCOM
 9

10

11

12                          - oOo -

13                 P R O C E E D I N G S

14           (REPORTER'S NOTE:  The following claim construction

15   hearing was held in open court, beginning at 1:04 p.m.)

16           THE COURT:  Good afternoon.

17           (The attorneys respond, "Good afternoon, Your

18   Honor.")

19           THE COURT:  I'll have you put your appearances

20   on the record for us, please.

21           MR. SQUIRE:  Yes, Your Honor.  Good afternoon,

22   Your Honor.  My name is Monte Squire from Young Conaway on

23   behalf of the plaintiffs, Helios Software and Pearl

24   Software.  I'm joined at counsel table with my co-counsel,

25   Cabrach Connor from Taylor, Dunham and Rodriguez.
```

```
 1              MR. CONNOR:  Good afternoon.

 2              MR. SQUIRE:  I'm also joined by my colleague

 3    Pilar Kraman from Young Conaway; and my co-counsel, Jennifer

 4    Tatum Lee from Taylor, Dunham and Rodriguez as well.

 5              THE COURT:  Welcome.

 6              MR. SQUIRE:  And also, the client is here,

 7    Mr. David Fertell from Pearl Software and Helios, as well as

 8    my colleague Robert Vrana from Young Conaway.

 9              MR. VRANA:  Good afternoon, Your Honor.

10              THE COURT:  Welcome to all of you.  Thank you.

11              MS. HANEY:  Good afternoon, Your Honor.  Megan

12    Haney from Phillips Goldman & Spence on behalf of defendants

13    Awareness and RemoteCOM.  With me today is Brian Moran and

14    Tom Donlon from Robinson & Cole, and we also have Brad

15    Miller and Lyndon Laemmerhirt from Awareness.

16              THE COURT:  Okay.  Welcome to all of you.  So

17    we're here for argument on a number of motions.  Have you

18    conferred on how you might like to proceed today,

19    Mr. Squire?

20              MR. SQUIRE:  Yes, Your Honor.  We have

21    conferred.  Unfortunately, we were not able to reach

22    agreement.

23              THE COURT:  Let's hear your proposal.

24              MR. SQUIRE:  We have a proposal that makes sense

25    based on the subject matter.  We proposed validity,
```

1    infringement, and damages be dealt with in that order.

2              And with specific motions, we'd like to start

3    with the inequitable conduct motion, Docket Item No. 212;

4    follow that with the *Daubert* motion in connection with

5    invalidity, Dr. Reinman, and that is Docket Item 221; and

6    then on the infringement, we have the defendants' motion for

7    noninfringement, Docket Item 209; and then we can go into

8    damages.

9              There are a series of damages motions.  The

10   *Daubert* with respect to Mr. Weingust, Docket Item No. 214.

11   There is a *Daubert* motion with respect to Mr. Grant, which

12   is Docket Item No. 217; and then the last is the partial

13   summary judgment motion in connection with damages, which is

14   Docket Item 205.

15             THE COURT:  So would your proposal be that you

16   all stand up three times or once for each motion?

17             MR. SQUIRE:  I think once for each motion, if I

18   understand Your Honor's question correctly.

19             THE COURT:  Well, for instance, there are two

20   validity related motions you mentioned.  Would you argue

21   them together?

22             MR. SQUIRE:  We would argue them together, yes,

23   but ...

24             THE COURT:  You may have different people.

25             MR. SQUIRE:  There may be different people doing

1    the argument.

2                THE COURT:  I think it I got it.

3                Let's hear what the defendants' proposal is.

4                MR. MORAN:  Good afternoon, Your Honor.  Mr. Moran.

5                When we were here last week, we had conferred on

6    the order and we had agreed at that point to do the

7    inequitable conduct motion first and then do the infringement

8    motions, and we didn't decide on the rest of the motions.

9                But to our way of thinking, the major motion

10   today is on noninfringement, and so we didn't want to leave

11   that, we wanted to deal with that relatively up front

12   because I think it's going to take a little more time.  So

13   we had suggested we want to start with the inequitable

14   conduct motion.  That's fine.  Then we should be able to

15   pick the motion that we want to do second.  It would be our

16   motion on noninfringement.  And then we can do the *Daubert*

17   stuff at the end.

18               THE COURT:  All right.  Fine.  Well, we'll take

19   turns picking motions, but I think we will end up largely

20   like what the plaintiffs have outlined but we'll see.

21   Plaintiffs can go first.  I take it they'll pick inequitable

22   conduct.

23               MR. SQUIRE:  Yes.

24               THE COURT:  And defendants are second.  I take

25   it you will pick summary judgment of infringement.

```
 1              MR. MORAN:  Yes.

 2              THE COURT:  And then we'll turn back to the

 3    plaintiffs on the next motion.  On each motion, we'll hear

 4    an opening, an answer, and a rebuttal.

 5              So plaintiffs, you are up first.  Start where

 6    you would like.

 7              MR. SQUIRE:  Yes, Your Honor.  We're going to

 8    start with inequitable conduct.

 9              THE COURT:  Okay.

10              MR. SQUIRE:  And just the at the outset, Your

11    Honor, we know Your Honor is familiar with the Therasense

12    case and the cases that have come down since Therasense, and

13    we think this motion our motion for summary judgment falls

14    squarely within the guidelines of Therasense and the cases

15    that have been decided since Therasense.

16              We're moving for summary judgment of no

17    inequitable conduct.  And it's defendants have raised it as

18    a counterclaim, I believe their second counterclaim, and

19    their sixth affirmative defense.

20              Your Honor, again I won't go into it.  I do,

21    just for the Court's benefit, we do have the cases and you

22    have our briefing and we have citations to all of the cases,

23    but I won't go into so much detail with the specific case

24    law because we think it is pretty established here, but I

25    will point out why we think we should win on our motion.
```

1          *Therasense* makes clear that to prove inequitable

2     conduct, the defendant has the burden by clear and

3     convincing evidence.  There are two prongs to that test, and

4     for each of those prongs, the *Therasense* requires that they

5     each be separately proved by clear and convincing evidence.

6          The first prong, Your Honor, is that the

7     patentee acted with specific intent to deceive the patent

8     the PTO.  And,

9          The second, of course, is this but-for

10    materiality requirement that the non-disclosed or the

11    alleged non-disclosed piece of prior art, but for it had

12    been presented to the PTO, the patent would not have issued,

13    that but-for materiality requirement.

14          Your Honor, here, and we'll go through the facts

15    in this case, and we think it's pretty clear, the defendants

16    just don't meet their burden for summary judgment.  They

17    still have to adduce evidence sufficient to go forward

18    beyond a summary judgment point.  And we think, Your Honor,

19    you can reach, you can enter our motion just based on their

20    failure to show clear and convincing evidence where it makes

21    a sufficient showing to get past summary judgment with

22    respect to the specific intent to deceive.  There is just

23    not, there is just no evidence in the record in accordance

24    with the case law.

25          Your Honor, again, I want to go through, we do

1   have this cited for Your Honor's benefit, and Your Honor is

2   very well familiar with the requirements.  But I will go

3   right to what the evidence is or what the lack of evidence

4   is, Your Honor, in the record.

5           The defendants' inequitable conduct claim is

6   based on a couple of points.  They make an allegation in

7   their amended answer, in their counterclaim that because

8   during the deposition, Mr. Fertell and Mr. Field made a

9   comment that they were an idiot for not patenting the Cyber

10  Snoop product earlier.

11          Your Honor, at that deposition, and what they

12  ignore, they would like the Court to believe just based on

13  that statement, that is evidence, that allegation is, based

14  on that deposition testimony, that must be evidence that

15  they had specific intent to deceive the Patent and Trademark

16  Office.

17          Your Honor, if you get to, if you look at the

18  actual testimony, it doesn't support that.  And it speaks

19  for itself.  It says that I was an idiot for not patenting

20  the Cyber Snoop product; but it goes on to say, Your Honor,

21  that I didn't make that mistake again when it came to this

22  awesome invention.  And it's talking about the '237 patent,

23  the patent they're alleging inequitable conduct on.  So that

24  is the deposition at the time that they rely on and that

25  they point to in their briefing.

1          Second, Your Honor, there is additional

2     testimony where they specifically asked Mr. Fertell about

3     the patentability of this Cyber Snoop.  The prior art

4     reference at issue, Your Honor, is this Cyber Snoop

5     reference.  We talked about it in the briefing.  The patent

6     at issue is the '237 patent.  It deals with remote access

7     configuration.

8          You will hear more about that, Your Honor, when

9     we talk about the infringement and the invalidity arguments.

10    There is a detailed discussion about the '237 patent.  For

11    purposes of the inequitable conduct argument, we focused

12    just on the evidence of, the lack of evidence of specific

13    intent.

14          Your Honor, here is the deposition testimony.

15    Additionally, at his deposition, Your Honor -- and, by the

16    way, I'd like to mention they deposed, Mr. Fertell was

17    deposed for 17 hours.  This is the whole of his testimony,

18    the whole of his testimony or the whole of the evidence that

19    they have with respect to this patentability or this

20    inequitable conduct issue.

21          Your Honor, during his deposition, he was

22    specifically asked:  And did you at some point think that

23    Cyber Snoop Enterprise 3.0 could be patentable?

24          This was Mr. Fertell's testimony.

25          I don't recall having an opinion about that one

1    way or the other.

2              That's the testimony, Your Honor.  That's what

3    he said.

4              Prior to that, there was another question about

5    patentability and he says:  These were two different

6    animals.  And we'll talk about that.  He describes it as two

7    different animals.

8              Also, Your Honor, they specifically talk about

9    the prior art, whether or not Mr. Fertell thought that this

10   was prior art, Your Honor.  They asked him about it at his

11   deposition.  And this is the evidence, this is the testimony

12   that was provided.

13             Do you think Pearl Software's Cyber Snoop

14   products were prior art to the Pearl Echo 4 product?

15             The Pearl Echo 4 product is a product that

16   embodies the patented invention.

17             Your Honor, this was his testimony:  No.

18             They asked him:  Why not?

19             Because they're complete separate animals in

20   every way.

21             That's Mr. Fertell's testimony on that issue.

22   That is what they base part of their motion for inequitable

23   conduct on.  They say that, they have a bald allegation that

24   he specifically withheld this reference from his attorneys

25   and he specifically withheld this reference from the PTO.

1          The testimony that we have doesn't support that.

2     It just doesn't support that.

3          What other evidence do they have?  Well, they

4     talk to the other inventor, the co-inventor Mr. Joe Field.

5     They asked him the same thing.

6          This is what he said about this prior art or

7     this alleged prior art reference.  They asked him to compare

8     the Cyber Snoop Enterprise and Pearl Echo 4.  And this is

9     consistent with what Mr. Fertell said.  Mr. Field said this

10    was a whole -- the whole architecture was completely

11    different.

12         That is the point, Your Honor.  There was never

13    any consideration by the applicants to think these things were

14    prior art because they were so different.  They were

15    completely different products.  They have completely different

16    functionality, and the architecture was completely different.

17    They're not the same thing.

18         And just based on the allegation, the evidence

19    in the record makes clear that they're not the same thing.

20    And, more importantly, for of specific intent to deceive,

21    Your Honor, there is no evidence in the record that Mr.

22    Fertell or Mr. Field believed them to be prior art.

23         In fact, the only evidence, the testimony at

24    this deposition, the 17 hours with Mr. Fertell, the only

25    evidence is that he thought they were, they thought that

1    they were completely different, that they were completely

2    different animals.  And they weren't sure.  There was no

3    decision as to whether or not they were patents.

4              Your Honor, here is a description of the two

5    different technologies.  The main point -- again, you will

6    here more about this certainly through infringement -- that

7    there were two different architectures.  There were two

8    different structures.  The claims are different.  The new,

9    the patented technology in the Pearl Echo system functions

10   completely different than the technology in the old system.

11   We talked about that in the brief, and you will hear more

12   about that today, Your Honor.

13             The other main allegation that they have in

14   their motion to talk about specific intent to deceive, Your

15   Honor.  And we think this is fatal, fatal to their

16   inequitable conduct claim.  They make arguments.  They say,

17   well, the patentees, maybe they didn't know it was prior

18   art, but they withheld this prior art from their attorneys.

19             The only evidence in the record, Your Honor, we

20   point, there is a letter, the '237 patent was the subject

21   of, there was some claims made against it of infringement.

22   There was some claims made against the Cyber Snoop product

23   for infringement.  So as part of that infringement analysis,

24   Your Honor, the same prosecuting attorneys that handled the

25   application that turned into the '237 patent, they

1    specifically looked at the Cyber Snoop product.  They were

2    provided the Cyber Snoop product, Your Honor.

3              Here is what this says.  The key part, it was

4    the subject, there was a letter, a cease-and-desist letter

5    in connection with the patent in suit.  They looked at the

6    Cyber Snoop 3.0, and based on our review of the Cyber Snoop

7    software ...  This is the evidence.

8              So their claim that well Mr. Fertell, Mr. Field

9    never mentioned or never turned over this Cyber Snoop product

10   to, to their attorneys, their prosecuting attorneys, is

11   belied, is directly rebutted by the fact that based on our

12   review, the Cyber Snoop product was considered.  So the

13   attorneys did consider it.

14             But, Your Honor, it doesn't stop there.  So this

15   is the evidence that we have in the record.  Additionally,

16   Your Honor, there was a privilege log that we produced in

17   this case.  And on that privilege log, Entries 81 and 82

18   actually deal with that review.  They're letter opinions

19   about that '404 patent complaint, or that '404 infringement

20   investigation.  So their opinions from Mr. William Logsdon,

21   who was also deposed in this case, and between Mr. Fertell,

22   and they specifically say that they're letter opinions

23   regarding that prior '404 patent allegation.  If you look at

24   the dates, Your Honor, the dates also support that.

25             So there was a written opinion that was done on

1    November 22nd, 1999.  And if you look at the key date,

2    12/23/99, if I go back to the prior slide, that was the date

3    of this letter.  So there was an opinion, so the attorneys

4    clearly considered and looked at this Cyber Snoop product.

5              So, Your Honor, we think that's the totality of

6    the evidence.  Even viewing it in a light most favorable to

7    the defendants, it don't come up to enough evidence to show

8    any specific intent to deceive.  Certainly, it's not clear

9    and convincing evidence, Your Honor.

10              The cases make clear, if it is evidence, let's

11   say we do think it is evidence, the cases make clear the

12   most reasonable, it has to be the single most reasonable

13   inference is that there was an intent, a specific intent to

14   deceive.  Based on all this evidence or at least the

15   evidence that is of record other than their just bald

16   assertion, the single most reasonable inference is not that

17   they had any kind of specific intent to deceive.  At best,

18   the inference is perhaps they didn't patent something before

19   but this time they want to make sure that they patented

20   their new invention and their ideas.

21              Then, lastly, Your Honor, just in the interest

22   of time, again, I think, we think that the motion can be

23   decided for failure of proof on a specific intent to deceive

24   prong, but we also should mention, in their briefing,

25   defendants do exactly what the *Therasense* cases say not to

1    do.  What they say is, well, we really don't have any

2    evidence, any strong evidence of specific intent to deceive

3    so let's talk about how material the prior art is.  That is

4    exactly, that materiality, that balancing of materiality and

5    intent that the case law says is impermissible.

6              You have two requirements, two separate

7    independent requirements for clear and convincing evidence:

8    showing specific intent to deceive and but-for materiality.

9    They don't make up for one another, Your Honor.

10             So we think, for all those reasons, we think

11   this falls squarely within the case law and that they

12   haven't adduced enough evidence to proceed past summary

13   judgment.

14             THE COURT:  It's the '237 patent that we're

15   concerned with; right?

16             MR. SQUIRE:  Yes, Your Honor.

17             THE COURT:  In the prosecution of the '237

18   patent, was any prior art disclosed by the patentees?

19             MR. SQUIRE:  There was prior art disclosed by

20   the patentees.  Anything that they had in their possession,

21   they turned over to their attorneys, anything that they

22   believed to be prior art.

23             This was their first patent, Your Honor, their

24   first series of patents, so they worked, they just worked

25   with counsel.  Counsel kind of led them as to what was to be

1    produced or what was prior art.  And they had no view as to

2    whether or not this particular, the Cyber Snoop product was

3    prior art.

4              THE COURT:  When you say it was produced, are

5    you saying the evidence is it was produced to their attorney

6    or also that it was produced to the PTO?

7              MR. SQUIRE:  It was produced to their attorney.

8    It was certainly given to their attorney.  Their attorney,

9    at least because of I guess the differences between the

10    technology and that they didn't believe that these were

11    prior art, we don't believe it was ever produced to the PTO.

12             THE COURT:  What is your understanding of the

13    counterclaim or affirmative defense?  Is it only directed to

14    the two inventors or is it also directed to --

15             MR. SQUIRE:  It's directed to the two inventors.

16    It was also directed to the attorney.  By the way, the attorney

17    did -- there was a deposition in this case.  Defendants'

18    counsel here didn't participate in that deposition.  But the

19    prosecuting attorneys were deposed, and they were asked

20    specifically -- we put in our briefing they were asked

21    specifically about this Cyber Snoop product.  And their

22    testimony was if it was prior art, if we considered it and

23    we thought it was prior art, we would have turned it over,

24    that that was their practice.  And they did have a specific

25    recollection, at least one of the attorneys had a specific

1      recollection of this particular piece of art.

2                  THE COURT:  So your summary judgment motion

3      would go to the attorneys as well to the patentees.

4                  MR. SQUIRE:  Yes, Your Honor.

5                  THE COURT:  Okay.  Thank you.  Let me hear from

6      defendants.

7                  MR. MORAN:  Your Honor, first of all, it's

8      important to note that they have moved for summary judgment

9      just on the issue of specific intent, so they have not moved

10     as to the issue of materiality or knowledge.

11                 THE COURT:  Meaning from your perspective, I

12     don't have to even evaluate whether you have enough evidence

13     from which the jury could find materiality.

14                 MR. MORAN:  More than that.  I think you have to

15     assume that those two things have been met, because they

16     haven't moved as to either of those two elements.  So it's

17     only as to specific intent.

18                 So the only issue here is whether the evidence can

19     support a finding that the single most reasonable inference to

20     be drawn from that evidence is that the plaintiffs

21     intentionally sought to deceive the Patent Office during the

22     prosecution of the '237 patent.

23                 Mr. Squire, in going through his slides, he almost

24     singularly focused on whether there is direct evidence of the

25     inventor's specific intent.  And we all know when looking at

1   these cases that it is rarely the case that you have specific

2   evidence of specific intent.

3           The courts all recognize that these cases turn

4   on circumstantial evidence.  And circumstantial evidence can

5   support this inference, a single inference that it was a

6   specific intent to deceive.

7           Your Honor, there have been some recent cases

8   decided post-*Therasense* that we have brought to the attention

9   of the Court within the past two weeks.  These are cases only

10  decided within the past month.  These cases make the point

11  that -- the facts are very similar to this case, and so I'd

12  like to just note those three cases.

13          The first is a case called *Kim Laube & Co. v*

14  *Wahl Clipper*, a Federal Circuit case.  This was a difficult

15  long prosecution, much like this case.  And it was in the

16  face of a rejection that an amendment was submitted to

17  overcome the prior art cited by the Examiner, and the prior

18  art in that case was Laube's own prior art product, much

19  like in this case.  What we're talking about is not some

20  third party prior art, we're talking about their predecessor

21  product, their own product.  And in that case, Laube failed

22  to bring to the attention of the Patent Office their own

23  prior product which had the very feature or aspect that they

24  used to distinguish the cited prior art and overcome the

25  rejection.  That is very similar to this case.

1          The other cases we brought to Your Honor's

2    attention is a Southern District of New York case called

3    *Worldwide Home Products v Bed, Bath and Beyond*.  Again, just

4    recently decided.

5          There, the prosecuting attorney had in his

6    physical possession a prior art -- that happened to involve

7    hangers -- a prior art hanger that had the very feature that

8    was used in amending the claim after rejection to overcome

9    the prior art.  While there, the attorney had submitted a

10   website image of this prior art hanger.  That did not

11   reveal -- in this case, it was the abutting of cascading

12   hook members that showed they were abutting, and it was that

13   feature that would have not allowed them to amend the claims

14   to overcome the prior art.  So, again, it was a question of

15   a long prosecution, faced with a rejection, deceiving the

16   Patent Office at that particular point in time to get and

17   push the claims through.

18         The third case is *American Calcar v American*

19   *Honda*.  There, there was a partial disclosure of prior art.

20   And like this case, that prior art system, which was a

21   navigation system in an automobile, had been used by the

22   inventor to build his own invention.  He based it on this

23   earlier piece of prior art.

24         And then when it came, again, in the face of

25   rejection, there was a misrepresentation or a failure to

1    describe the prior art in a full sense to call out the

2    feature that was the subject of the claimed novelty and

3    would have rebutted that claimed novelty because it was in

4    fact a feature found in the prior art navigational system.

5            So the same thing happens here.  The '237 patent

6    was rejected -- long, prosecution history, was rejected in

7    view of two prior art patents.  An appeal was taken and

8    lost.  So Pearl, at that point, had to go back to the

9    drawing board.  They had to discuss with their counsel how

10   are we going to overcome this rejection?

11           What they did was they moved two claims, which the

12   provisional application were claims 9 and 10.  They moved that

13   into claim 1 of the '237 as additional limitations in elements

14   1(f) and 1(g).  It was based on that, that they overcame the

15   prior rejection.

16           Well, those limitations relate to control settings

17   based on a communication protocol and use, and determining the

18   communication protocol by looking at conveyed data, and then,

19   based on that determination, applying access restrictions or

20   allowing or blocking based on these control settings based on

21   the communication protocol and use, and determining the

22   communication protocol and use by looking at conveyed data.

23           So these two features are found in the Cyber

24   Snoop Enterprise 3.0, and that is the key thing that makes

25   this case likes like *Kim Laube* where the limitations were

1    found in the patentee's own prior art product, Cyber Snoop

2    Enterprise 3.0.  And so the only differences between the

3    Cyber Snoop Enterprise 3.0 and the claimed invention of the

4    '237 relate to the application of the control settings at

5    the client rather than at the server.  That was the diagram

6    I showed you.

7              And the other difference was that Pearl Echo,

8    the product that they claim is a successor to the Cyber

9    Snoop Enterprise and the subject or preferred embodiment of

10   the '237, simply added some additional communication

11   protocols to the list that Cyber Snoop 3.0 also control.

12             And the other thing that is similar to the

13   *American Honda* case is that the prior art product, the Cyber

14   Snoop Enterprise 3.0 was actually used and relied upon by

15   these inventors in building the claimed invention.

16             So when you talk about what is the circumstantial

17   evidence that we rely on, the facts we believe are egregious.

18   And since those depositions and when the Court allowed us to

19   amend these claims, the additional facts that were developed

20   only serve to confirm the inequitable conduct.

21             So, first, the Cyber Snoop 3.0 source code was

22   actually submitted as part of the provisional application

23   for the '237.  The Pearl Echo 4.0 product, which is their

24   preferred embodiment, was first named Cyber Snoop Enterprise

25   4.0.

1          The Pearl Echo 4.0 was built upon, by their own

2     testimony, and we provided annotations and we included a

3     whole list of facts in our brief annotated to the supplemental

4     summary judgment appendix.  So the Pearl 4.0 was built upon

5     the Cyber Snoop Enterprise 3.0.  It incorporated source code

6     from the Cyber Snoop Enterprise 3.0.

7          Pearl, at different points in time, represented,

8     in one case to a would be investor, in another case in a

9     press release, that the Cyber Snoop Enterprise was covered

10    by their pending patent application.

11         The prosecuting attorney, Mr. Knutson testified

12    that he did not recall plaintiffs Mr. Fertell and Mr. Field

13    bringing the Cyber Snoop Enterprise 3.0 to his attention.

14    He testified that he did confer with both inventors

15    regarding the rejection and sought their input in amending

16    claims.  Mr. Knutson informed both inventors of the need to

17    disclose prior art, explained to them what constituted prior

18    art.

19         Mr. Knutson testified that had he known about

20    the Cyber Snoop Enterprise 3.30, he would have disclosed it.

21    Both Mr. Fertell and Mr. Field signed inventor declarations

22    acknowledging their absolute duty of candor.  And when

23    Mr. Squire pointed to the opinion letter that was given by

24    Mr. Knutson's firm with respect to that '404 patent, I would

25    point out to Your Honor that that at best would mean that

1        Mr. Knutson looked at the Cyber Snoop Enterprise for an

2    entirely different purpose in response to a cease-and-desist

3    letter as to whether the Cyber Snoop Enterprise 3.0 infringed

4    a completely different patent.  Also, that analysis, that

5    was done two years earlier than the provisional application

6    that was submitted in support of the '237, so I don't see

7    where that gets them off the hook at all.

8             So in this case, again, I think this is a case

9    where it's very much like these three recently decided cases

10   where the rubber meets the road.  After you have gone

11   through a long prosecution, your claims have been rejected,

12   you need to take an appeal, you lose that appeal.  You go

13   back to the drawing board one last time.  You come up with

14   an argument to overcome that prior art.  And what you come

15   up with is two features, each of which is undeniably found

16   in this prior art product, their own prior art product, the

17   Cyber Snoop 3.0 which they relied on, built upon, incorporated

18   source code from in building the Pearl Echo product.

19             We think it's a clear case where the only

20   reasonable inference from that is that they specifically

21   tried to put one over on the Patent Office and get this

22   claim through.

23             And the evidence from the deposition, again, it

24   is not surprising that you'd have a lack of direct evidence

25   or direct admission.  That is not the way these cases

1    typically occur.

2                So I think from the circumstantial evidence,

3    there is more than enough there.  And there is also going to

4    be an issue as to the credibility of this testimony.

5                In these cases that I mentioned, these three

6    cases, one of the issues is the credibility of the inventors

7    testimony where the prosecuting attorney's testimony and

8    that is really for the Court to decide listening to it as to

9    whether the evidence lends itself to a clear and convincing

10   proof of specific intent to deceive.

11               I don't think that can be determined on summary

12   judgment.  We have enough evidence here.  It was the

13   evidence that Your Honor found sufficient at the pleading

14   stage that allowed us to amend if anything, further

15   discovery confirmed that.

16               THE COURT:  What is in the record about whether

17   there was any prior art disclosed to the PTO?

18               MR. MORAN:  They did not -- my recollection is

19   that they did not disclose any prior art.  There was

20   testimony to that effect --

21               THE COURT:  And that --

22               MR. MORAN:  -- by the prosecuting attorney.

23               THE COURT:  I know you say I have to consider

24   all the circumstances.  How do you factor that one in that

25   this was a prosecution perhaps unlike most in which nothing

1    was disclosed at all?

2              MR. MORAN:  I don't think it helps them because

3    they have an experienced attorney who knows and understands

4    the obligation to submit prior art.  He had, he admittedly

5    had discussions with both Mr. Fertell and Mr. Field,

6    explained it to them what the obligation was, what prior art

7    consisted of and what would represent prior art.

8              He put it to them that way, and they didn't,

9    either they didn't reveal it or they revealed it two years

10   early but they didn't, going particularly at the point where

11   the amendment is made and they're relying on these two

12   features that are obviously found and there is testimony on

13   that, that is not rebutted that these features, the ones

14   that they added, moved up into claim 1, are clearly found in

15   the Cyber Snoop Enterprise 3.0.

16             THE COURT:  For you to prevail in the entirety

17   on this motion, so everything on an inequitable conduct

18   stays in, do I have to find that intent to deceive is the

19   single most reasonable inference not only for the two

20   inventors but also for the attorney as well?  Does there

21   have to be evidence of all three of them were in on the

22   fraud?

23             MR. MORAN:  No, I don't think you have to have

24   evidence all three were in on the fraud.  I mean he is their

25   agent.  In some of these cases, it's sadly on the inventors

1    and some cases it's on the prosecuting attorney, some cases

2    it's on both of them.  You look at the totality of the

3    conduct there on the part of the inventors and the

4    prosecuting attorney and draw the inference.

5            So at this point, particularly in the absence

6    of assessing their credibility, I don't think that it can

7    be said that this evidence can't support this single most

8    reasonable inference of specific intent.  And that is why I

9    think this has to, this can be granted at this point in

10   time.

11           THE COURT:  And there is some evidence in the

12   record about name changes.  I think there was reference in

13   the argument to Cyber Snoop versus Pearl.  Is that evidence

14   helpful to you about changes of names?

15           MR. MORAN:  I couldn't represent that, Your

16   Honor.  I think they did it for other reasons.  I think they

17   did it for marketing reasons.  Pearl Echo is something that

18   they chose because its echo reflects their desire with these

19   inventions to mirror data in real-time and to stream data in

20   real-time, and that is what these patents are about.  So I

21   don't think they changed the name to hide prior art.  I can't.

22           THE COURT:  You are not alleging that.

23           MR. MORAN:  No.

24           THE COURT:  All right.  Is there anything else?

25           MR. MORAN:  No, Your Honor.

1          THE COURT:  All right.  Is there any rebuttal on

2     this?

3          MR. SQUIRE:  Yes.  Very quickly, Your Honor.

4          I think we heard defendants' argument and it's

5     just the classic argument that people have made both before

6     *Therasense* and since *Therasense*.  It's a materiality

7     argument.  If you look at all the allegations, they're the

8     same allegations that defendants put in their counterclaims,

9     their assertions that talk about how material this alleged

10    piece of prior art is and talk about how, how it is embodied

11    in the patent-in-suit.  We disagree with that, Your Honor.

12    But we don't even have to get there.

13          And what the defendants skirt over is they still

14    have to show, looking at the evidence that is in the record,

15    the specific intent to deceive and they have to have

16    evidence that supports that.

17          And Your Honor specifically pointed at it

18    looking at the evidence, yes, sure, it's a circumstantial

19    evidence case, but looking at the evidence is the single

20    most reasonable inference that the patentees or that

21    patentees' counsel, based on the evidence, that patentees'

22    counsel intended to deceive the PTO.  And they did not.

23          When I was up earlier, Your Honor, and Your

24    Honor was correct, the patentees did not submit any prior

25    art at all in connection with this application.  And they

1    did -- there is testimony in the record that they were

2    certainly, that the prosecuting attorney certainly informed

3    them of their requirement to do that.  And to the extent

4    that they viewed something to be prior art, they knew of

5    their obligation to do that.  But the testimony that we

6    looked at, Your Honor, at their deposition, they didn't

7    believe that it was prior art.  They believed that these

8    inventions were very, very different.  It was their view

9    that they were wholly different architectures.  This was

10   their first patent application.  They know that this was

11   very different.  They would have any considered that.  And

12   that is the evidence that is in the record.

13            Regarding the cases that defendants cite, those

14   cases are distinguishable, Your Honor.  First of all, none

15   of the cases change *Therasense* or the case law that has been

16   well settled in *Therasense*.

17            And, if anything, the cases actually support our

18   position that there is no specific intent.  Certainly, there

19   is not enough evidence of specific intent to deceive in this

20   case.

21            When we talk about the first case that they

22   talked about was the -- and Mr. Moran said, well, it's a

23   Fed Circuit case.  Well, Your Honor, it was a Fed Circuit

24   affirmance under Rule 36.  There is no analysis, and there

25   is no detailed discussion there.  There are a lot of reasons

1    why the Fed Circuit could have affirmed that case, and the

2    fact that they affirmed it is not precedential.  It doesn't

3    give any light as to what the basis was.

4              But if you look at the facts, the facts are

5    distinguishable in that case.  In that case, which is the

6    *Lob* case, Your Honor, the inventor was very active in the

7    prosecution.  The inventor was on some of the Office

8    Actions.  There was some testimony that the inventor was

9    misleading in the testimony to the Examiner.  There is

10   testimony in the record that the inventor gave inconsistent

11   statements throughout the deposition.  There is testimony

12   that the inventor selectively choose what and what not to

13   present.  And when there were specific questions asked at

14   the inventor's deposition, the inventor conveniently forgot

15   certain information but added helpful information.  So the

16   Court looked at that and in that case, which is not the case

17   here, made a determination that there was evidence of intent

18   to deceive.

19             But the facts of that case are different here,

20   Your Honor.  There is also a lot of evidence in that case

21   about but-for materiality and the case deals with that.  We

22   don't have those circumstances here so we think that case

23   is distinguishable.  And if you compare the conduct of the

24   applicant in that case to what evidence that we have and the

25   testimony we have from Mr. Field and Mr. Fertell, it clearly

1    is distinguishable from that case.

2            The second case, Your Honor, the *American*

3    *Honda* case is a Third Circuit case.  That case is also

4    distinguishable for a couple of reasons.

5            Again, that case focused on the inventor had

6    gave previous testimony in another case, Your Honor.  The

7    Court found that that testimony and those affidavits were

8    inconsistent, and based on those inconsistencies, the Court

9    could make a determination as to whether or not there was

10   an intent to deceive, and the Court had specific findings of

11   this in the record.

12           None of that record is here in this case.  None

13   of those facts are presented in this case.  So we think that

14   that case is distinguishable.

15           Then the last case that is the Southern District

16   of New York case, Your Honor, the *World Home Products* case.

17   If you look at that case, that case obviously had to do with

18   hangers, so it wasn't software.  It wasn't the difference

19   where we're dealing with two completely different animals.

20   It had to do with hangers and how comparable these hangers

21   were.  And even in that case, the Court had actually found

22   that, clearly, this is something that the inventor knew

23   about and should have disclosed or should have provided

24   and didn't.

25           In that case -- this also is distinguishable.

1    In that case, there was an expert that the Court hired or

2    that the Court allowed testimony from an expert in patent

3    prosecution, a former PTO Examiner.  And the PTO Examiner

4    offered an affidavit that said, based on all this evidence,

5    there clearly was clear and convincing evidence of intent to

6    deceive, and the Court relied on that in that case.  That

7    is not typically what occurs in Your Honor's cases, and we

8    don't think there is that kind of evidence in the record in

9    this case.

10               THE COURT:  Is it right that the only issue I have

11   to assess is whether there is sufficient record evidence for

12   the fact-finder to conclude that specific intent to deceive

13   the PTO is the single most reasonable inference?  That is the

14   only issue presented by this motion; correct?

15               MR. SQUIRE:  We think that is the basis of our

16   motion, Your Honor.  But we think if Your Honor even looked

17   at the but-for materiality, that doesn't get you there.

18   There is not enough evidence to even get you there, Your

19   Honor.  There is no evidence and we know what the record

20   evidence is.  There is just not enough evidence to get past

21   or to show a specific intent to deceive.

22               THE COURT:  Okay.  Thank you very much.

23               So we'll move on to defendants' choice of

24   motion.

25               MS. HANEY:  Computer 1.

1                    MR. MORAN:  Where?

2                    (Elmo settings adjusted.)

3                    MR. MORAN:  Your Honor, we're going to start

4        with the '237 patent.

5                    This is a patent that we really can't understand

6        how this '237 patent has remained in this case following

7        this Court's ruling that the Doctrine of Equivalents is out.

8        We really feel it's beyond the pale for Awareness to

9        continue to assert this patent and to be put to the burden

10       of obtaining summary judgement given that the Doctrine of

11       Equivalents is out and given how fundamentally different

12       ATI's system is from that claimed in the '237 patent.

13                   To us, it's pretty clear that the plaintiffs

14       relied on the Doctrine of Equivalents with respect to the

15       seventh step of the seven step patent here.  And while there

16       was one reference to relying on literal infringement, it was

17       in a conclusory fashion, and it wasn't supported factually

18       by any analysis in evidence.

19                   So this patent has seven distinct steps.  They

20       must occur in the prescribed sequence.  So each of those

21       necessarily has to be there.  It has to be there in the

22       prescribed steps and sequence in order to have literal

23       infringement.

24                   So what this patent basically involves is a

25       client calling in to a first address in a network to get a

1    second network address.

2            And during that connection to the second network

3    address, one obtains an access configuration, which Your

4    Honor has defined in the *Markman* construction as rules for

5    blocking and allowing access.

6            Then the third thing is that the client

7    establishes a third session during which the conveyance of

8    data is controlled by the previously downloaded access

9    control rules.

10            A fourth feature of this patent is that part of

11    the conveyed data from this third session -- and this is

12    the session between the remote user and a remote -- it can

13    be somebody, they're having a web chat or can be visiting a

14    website.  So it's during that session that you're attempting

15    to impose these access restrictions, allowing and blocking.

16            The part of the data conveyed from that third

17    session has to be sent to the second network address via the

18    second session.

19            And then, lastly -- and this is a fundamental

20    difference between the two technologies -- is the access

21    control, the blocking and allowing in the case of the patent

22    are applied based on a determination of the communication

23    protocol and use.  By that, I mean the communication protocol,

24    whether it's a web, whether it's an e-mail application,

25    whether it's a chat session.  So you determine what kind of

1    a session it is.  There is a uniform set of rules that are

2    applied to each different protocol, and the determination as

3    to whether -- what the protocol, communication protocol and

4    the use is made based on analysis of the conveyed data in

5    transit at the network or transport level.

6              This contrasts with Awareness' product which is

7    only controlling particular applications that are loaded on

8    to a user computer.  They're not looking at communication

9    protocols as data that is being transferred or conveyed.

10   They're not blocking based on communication protocols.  They

11   only block particular applications.  It's like the difference

12   between blocking a highway, a particular communication

13   protocol, or blocking particular cars from entering that

14   highway, which is what Awareness does.

15             So if I could have the next slide.

16             So this was from Your Honor's *Markman* ruling.

17   There was an issue around whether "access configuration"

18   entailed rules for controlling access, allowing blocking.

19             Your Honor's *Markman* opinion made it clear that

20   the "access configuration" consists of rules for controlling

21   access, and they have to have a control setting, which there

22   is a rule for at least allowing or blocking.

23             This will become critical when we get to look at

24   the particular respects in which the Awareness product does

25   not meet these limitations.

1          If I could have the next slide, please.

2          So this is it again.  I have already kind of

3     gone through this, so let's go on to the next slide.

4          So one of the requirements of the claims --

5     well, not a requirement.  The patent contemplates that the

6     call in to get the access configuration would go to a server

7     computer.  One of the things I want to point out is that in

8     the case of the plaintiffs' product, they have a single

9     server computer which does this.

10         Awareness has a different technology in that

11    they have a number of separate servers.  And they don't

12    have, unlike the monitor computer or server computer in the

13    plaintiffs' product and diagram, they don't display anything

14    at their server.  They don't have a mouse or key or any kind

15    of display.

16         What they have is a rack of different servers,

17    stacked in a rack.  They have 20 plus servers, each of which

18    performs a different function, each of which has a separate

19    network address.  While they're located in the same place,

20    they're not the same server.

21         What happens is, in their infringement analysis,

22    they try to conflate and treat Awareness' rack of different

23    servers as one big virtualized server.  That's a fiction,

24    it's not accurate, it's not what Awareness does because

25    each of these different servers again performs a different

1    function.  They have a different network address.  Each of

2    them may have their own virtual servers.  So instead of

3    virtual servers, they're clones.  But the whole body of a

4    rack of servers is not one big virtual server.

5           This was their argument for the doctrine of

6    equivalents, and there is no way around it.  There is no way

7    to get to literal infringement based on the fact that these

8    are different network addresses for different servers

9    performing different functions.

10          More than that, they don't perform the functions

11   in the sequence required by the patent.

12          If I could have the next slide.

13          So in terms of the control settings, in the

14   case of Awareness, you can see on the left there these are

15   control settings.  These are the rules.  And in Awareness'

16   case, these rules are not downloaded in that second session

17   or second step of the seven step patent.  They're downloaded

18   upon license of validation.  They're really done over the

19   first communication session, from the first network address,

20   and not in the second communication from the second network

21   address.

22          So if I can get the next slide.

23          So one of the requirements of these claims is

24   that there be, during that second session, that you download

25   access control -- access configuration rules in that second

```
1     session.  And this is the evidence that the plaintiffs rely

2     on to meet that limitation.

3                What this is, is simply an encrypted list of

4     URLs.  It's not the equivalent of a set of access rules.

5     It's just a list of URLs or websites.  There are no rules

6     associated with this.  And so this is their reliance to meet

7     that second limitation.  It just doesn't work.  A list of

8     URLs, it's not the same thing as a set of access configuration

9     or rules for allowing or blocking.

10                The next slide.

11                This next slide, it's a little hard to read but

12    you have it in front of you.  The point of this is their

13    expert, Dr. Nettles has relied on the same evidence to try

14    to demonstrate an access configuration, including a control

15    setting or set of rules for 1(d).  This has got four of

16    them.  The independent claim.  And yet for claim 2(a), a

17    dependent claim, he relies on it to be an access

18    configuration including a list related to the control

19    setting.

20                The point here is that a list, something can't

21    be both a list related to control setting and a control

22    setting, particularly where the list says nothing about

23    blocking or allowing.

24                So we believe they're being disingenuous in

25    arguing that a list of URLs can be a control setting or a
```

1    set of rules.  And they're using the same piece of evidence

2    for two separate completely different elements which just

3    shows how disingenuous this analysis is.

4              So if I can have the next slide.

5              So these are figures from the '237 patent.

6    Figure 2, they're control settings or rules.  And you can see

7    how they're applied based on the communications protocol;

8    namely, web, FTP, e-mail, news, or chat.  And Figure 3 is a

9    list related to a control setting.

10             So they view them and they acknowledge them with

11   different figures as being two separate things entirely.

12             So if I can have the next slide.

13             So you will recall I said that Awareness does

14   not block or allow based on the communications protocol and

15   use.  They simply apply controls to different applications.

16   So there will be a particular e-mail application or a

17   particular web application and they will either support that

18   or they won't.  So they are not applying a set of uniform

19   rules that blocks the highway or blocks all e-mail, or all

20   web traffic, or all chat.  They only block certain particular

21   applications or brands.  And these are the analogy to the

22   cars.

23             So if I can have the next slide.

24             So this is a distinction with a difference.  The

25   idea of blocking protocols at the transport layer or blocking

1    applications.  So this again is the way they do it, the

2    plaintiff.  And you can see in the top there that they --

3    and on their website, they advertise this difference.  They

4    make the point they block security way down low.  That they

5    analysis network protocols so you don't have to worry about

6    application choices.  You don't have to worry about whether

7    a particular chat application or e-mail application will be

8    blocked because they're all blocked.

9              If I may have the next slide.

10             So this is a PC magazine analysis or review of

11   Awareness' software on the top.  And they actually make a

12   criticism of Awareness' software, WebWatcher, by saying it's

13   not browser independent.  Namely, it only blocks particular

14   applications.  And the quote, the second quote there is

15   from an Awareness executive who said that they opted for a

16   browser-based approach as opposed to protocol level logic

17   for business reasons.

18             And then if you look at the Pearl there, again,

19   they're advertising or noting the fact that their product is

20   protocol based.  It applies controls based on protocols.

21   They say if you change Internet applications, Pearl Echo

22   will not be affected because it runs at the protocol level.

23             So, again, this is a distinction with a

24   difference.

25             We also submitted at Exhibit 8 to Mr. Miller's

1    affidavit an internal document where Awareness actually

2    looked one time and considered changing from a browser-based

3    approach or application-based approach to a protocol-level

4    approach.  They talked about the relative advantages and

5    different advantages and decided not to do it.

6              If I can have the next slide.

7              So, again, this is designed to show that what

8    you have again with ATI or Awareness is these physically

9    different servers, they're within the dotted lines, within

10   that rack on their particular server farm because this is

11   all in the cloud.

12             So each of these has a different network

13   address.  They serve different purposes.  They perform

14   different functions.  And so this session 1 is one whereas I

15   said that's the session where the license validation is done

16   and the control settings are sent to the client computer,

17   not in session 2, as required by the seven steps of the '237

18   patent.

19             So that is the fourth step or 1(d).

20             So during the second session, all that Awareness

21   may do is download a list of URLs.  That's it.  No rules are

22   being sent down.

23             Then the other thing that is important is that

24   session then terminates.  There is nothing ever uploaded to

25   this address, the second address.  There is no data, conveyed

1    data going to that second network address.  That is step 7,

2    1(g).

3            That is one of the reasons why they had to come

4    up with a doctrine of equivalents, to try to make this fit,

5    with the notion that this farm is one big virtualized server.

6    It's not.  It's not one big virtualized server.  It's

7    separate and distinct servers serving different functions

8    and purposes with separate network addresses as to which

9    there are separate sessions.  They're out of sequence.

10   They're not doing that which is required during that

11   sequence.

12           And then the session 3 is the one between the

13   client computer, and it can be the Internet or somebody you

14   are chatting with.

15           And it's only in the fourth.  There is a fourth

16   session of Awareness, and that is the only time where any

17   data is conveyed, or conveyed data or upload of that data

18   related to session 3.  They don't -- it's not done with

19   session 2.

20           If I could have the next slide, please.

21           So this is their doctrine of equivalents

22   analysis from Dr. Nettles.  Dr. Nettles had an infringement

23   report in which he, again, he paid lip service to the notion

24   of literal infringement, but then he referred the reader

25   to Exhibit 1 of his report which is the InterGuard Suite

```
 1    appendix.  And as he said, in there, you will find my

 2    claim-by-claim analysis, my element-by-element analysis.

 3                   When you go to that Exhibit 1, the only analysis

 4    is doctrine of equivalents with respect to that seven step,

 5    1(g).  And he relies on this notion of a one big virtualized

 6    server and basically says as long as it goes to that, it

 7    somehow satisfies this requirement of step 2 and step 7 --

 8    step 4 and step 7.  It's not factually accurate.

 9                   If I could have the next slide, please.

10                   So in this case, this is from his Exhibit 1,

11    this claim-by-claim analysis.  The paragraph on the left,

12    he recognizes there, when he is trying to show compliance

13    with certain steps of the '237, he relies on different network

14    addresses, a first network address and a second network

15    address, and the need to, in order for literal infringement

16    of those steps and those elements, to have that kind of

17    separate network address and separate network, and the fact

18    that they're separate servers with distinct network

19    addresses for purposes of those steps, 1 through 4.

20                   But when he comes to claim 7, 1(g), he is

21    claiming that this all is one big virtualized server and

22    therefore it's equivalent to the second network address.

23    They don't have the ability to rely on doctrine of

24    equivalents anymore.  And they don't have -- they can't

25    point to anything that would overcome that.
```

1            What he does point to -- if I could have the

2    next slide -- is testimony from Jason Fitch, and he was the

3    CTO of Awareness, where he is talking about a particular

4    network address, datasonarcentral.com which handles requests

5    from clients, it's what its function is.

6            And then there is a question about whether there

7    are virtual servers associated with that particular network

8    address.

9            And, again, each of those separate servers may

10   have clones that do different functions related to that

11   particular purpose or process.  But they're not -- that

12   doesn't mean that all of the network addresses and all of the

13   functions which are performed by separate servers are part of

14   one big virtualized server.  And Mr. Fitch makes that point

15   in the right-hand column at line 10 where he actually takes

16   issue with the notion that the same 12 virtual servers also

17   host a configuration for the clients.  He says no, that is

18   not accurate.  The configuration rules again are subject of

19   a different server, as are the uploads, again, at different

20   network addresses.

21           If I could have the next slide.

22           One of the other requirements of this patent and

23   claimed step 7 is that this second network address has to be

24   left open and receive conveyed data from the third session.

25   And this slide relates to Mr. Nettles' intent to distinguish

1    prior art cited with respect to the Cohen patent and the

2    '237.

3              There, he makes a point that a list of URLs

4    that were blocked is not conveyed data.  Conveyed data, in

5    his mind, when he is distinguishing the prior art, means the

6    actual data that was exchanged.  In essence, it went over

7    the wire.  And a list of URLs is something that was blocked

8    is not conveyed data, which is another reason why step 7 is

9    not met particularly about that second session, because, as

10   I said, the second session gets terminated without uploading

11   any data.

12             So can I have the next slide.

13             So I think, again, there are separate network

14   addresses, a first network address, a second network

15   address, and then there is a fourth network address in

16   the Awareness system, the distinct addresses performing

17   different functions and they're not performing them in

18   the requisite steps of the '237 patent or in the sequence

19   required by the '237 patent.

20             Part of the problem with his analysis when he

21   did it, Nettles, Dr. Nettles, was that his analysis was

22   pre-claim construction, and he assumed a list of websites

23   might qualify to be a control setting.  It clearly doesn't

24   in view of the *Markman* decision of Your Honor.

25             Could I have the next slide.

1          So this is a case where there are multiple

2     elements that are missing in this '237 patent, which is

3     why we believe it is really beyond the pale that they're

4     continuing to assert this following Your Honor's ruling on

5     doctrine of equivalents.

6               ATI Server is not a Server Computer as defined.

7               It doesn't download a control setting in step 4.

8               There are no rules that are downloaded in that

9     step.

10              It does not -- 3, it does not control

11    communications protocols in steps 4 and 6, only selected

12    applications.  This is a distinction with a difference as

13    recognized in their own documents.

14              ATI does not send any conveyed or recorded data

15    to that second network address via the second communication

16    session, as required by step 1(g), the seventh step.

17              And, as I said, he relied, they relied on the

18    doctrine of equivalents for 1(g), but now they're making

19    this claim of literal infringement but with no detail, no

20    support or based on some misunderstanding as to how the

21    servers actually work at the Awareness server farm.

22              So if I can have the next slide.

23              So the fourth step and the sixth step are not

24    met.  The fourth step because again there is a download of a

25    control setting.

1          Also, there is a difference between controlling

2     communications protocols based on captured data in transit

3     versus the application method which is screening data from

4     selected applications and blocking or allowing those.

5          If I could have the next slide.

6          Again, Awareness only controls a limited number

7     of web browsers and e-mails and instant message programs.

8     They don't block the highway.

9          Can I have the next one.

10         This is the seventh step, and there is no way

11    around this without the doctrine of equivalents.

12         Awareness does not send recorded data to the

13    second network address via the second communication session,

14    after the third session is open.  They just don't do it.

15    They shut it down.  There is no conveyed data going back.

16         THE COURT:  If we were to agree with you on

17    1(g), do we have to reach all the other failings you find?

18         MR. MORAN:  Not with the all elements rule, Your

19    Honor.  If you find any one of these is not met, and not met

20    literally, we're done.  You know, there is no infringement.

21         We would like to have an order for appellate

22    purposes.  I think it would make it -- I think it's

23    appellate proof on one of them, but obviously there are

24    multiple steps and aspects of each step that are missing.

25         So I can go on to the next patent.  I don't know

1    whether you want to have them respond on the '237 or have me

2    wait on that.

3              THE COURT:  We're kind of on your time.  It was

4    your choice.  So would you prefer to be heard on the rest of

5    your motion or do you want to hear from them?

6              MR. MORAN:  I'll go on, Your Honor.

7              THE COURT:  Okay.

8              MR. MORAN:  All right.  So while the accused

9    product and the patent claim both entail methods for

10   recording a remote monitoring of internet activity, that is

11   really where the similarity ends because they do so with

12   fundamentally different ways.

13             As I mentioned, the Pearl Echo product, their

14   patented product functions at the protocol and transport

15   level being its capturing data of first Internet session

16   as it is actually in transit or being exchanged.  And the

17   reason they do that is because they want to provide, they

18   want to mirror that data or stream it in order to allow

19   real-time monitoring.

20             That's central to the '304 patent.  It's all

21   about being able to facilitate real-time monitoring.

22             So when Your Honor came out with his rulings on

23   Internet session at the *Markman* ruling, and what was meant

24   by real-time, the plaintiffs ended up dropping the '571

25   patent which was referred to as the real-time patent.  We

1    expected them similarly to drop the '304 patent because the

2    '304 patent is, again, the object of it is to facilitate

3    real-time monitoring, which is why they have this element of

4    concurrence that is central to the claim 9, which is the

5    independent claim left in the case.

6              So they've got this obligation of concurrence,

7    the only purpose of which is to facilitate real-time

8    monitoring.  It serves no other purposes.  There is no other

9    reason to have that term in that claim 9.

10             So in contrast to -- well, one other aspect of

11   the claim 9 patent is that there are these three sessions:

12             There is the monitored session, which is session 1.

13             Then there is a second session which we call the

14   gateway session.

15             Then there is a third session by which we do the

16   monitoring.  And, in their case, they want to be able to do

17   real-time monitoring.

18             But the second session, this intermediate

19   session, is designed for load balancing, handling multiple

20   requests from their customers who want to look at the data

21   in real-time.  So it has a particular purpose that is

22   evident from the specifications.

23             We maintain that Awareness lacks that second

24   session.  They rely on a DNS lookup or domain name resolution

25   to satisfy that second session, and we'll explain why that

1    doesn't work.

2              So this system that they have created which

3    functions at the protocol and transport level that is

4    capturing data as it's being exchanged, streaming it in the

5    third session to allow for real-time monitoring, is far

6    different than what Awareness does.

7              What Awareness does, it doesn't involve

8    real-time monitoring.  That is why they dropped the '571

9    patent.  Where Awareness' technology itself is designed to

10   record data that is stored in selected applications, they

11   scrape those applications looking for activity.  When they

12   find it, they write it to a file, then they store it in

13   cache, and then only later do they upload it to their server

14   farm.

15             And even when it goes to the server farm, you

16   saw those servers don't have any display or monitors there.

17   It's only in a later session, the fourth session that

18   clients can call in to a particular server at that farm

19   where they can look at the data after the fact and see what

20   was happening.  So it's the difference between a wiretap,

21   where you are looking to listen in live, and a voice mail

22   system which is what Awareness' product is like.

23             So Awareness, because they're not interested

24   in real-time monitoring, they're not having any concurrent

25   sessions.  They don't upload any data at the same time that

1    that activity is going on.  It's always after the fact when

2    they scrape data from the application, then they process it,

3    it's written it to a file, put it in cache, that they later

4    upload it.

5              So there is not this concurrence between their

6    alleged second session, third session, and the first session.

7              Whereas what the patent is all about is having

8    concurrence of that second session with the first session

9    and handing off the second session to the third session.  So

10   the second and third session cover that first session from

11   start to finish.  That is how you capture and stream it in

12   real-time.  Awareness doesn't do it.  It does it in chunks

13   and delayed chunks and bursts.

14             So if I can have the next slide.

15             So one way to understand this is to come up with

16   a Superbowl analogy.  The idea is you have a pay-per-view

17   access only Superbowl offering with no commercials.

18             So Pearl would be like the NFL Network that is

19   recording or broadcasting the Superbowl live with the

20   authorization of the NFL because it's not -- so Pearl would

21   record the Superbowl as one long continuous session.  Pearl

22   would upload the recording in one continuous stream so that

23   all viewers can watch it in real-time.

24             They would also upload the recording to

25   www.NFLnetwork.com where the site would determine, this is

1     the gateway step, determine all pay per view subscribers

2     who go forward with the broadcast and then given that the

3     Superbowl is treated as one single continuous session, they

4     would also invoke DNS to resolve the web address or domain

5     www.NFLnetwork.com/Superbowl to an IP address.

6            So then after determining who the specific pay

7     per view subscribers were in that second session, they would

8     forward the recording to those specific TVs so that they

9     could watch it in real-time.

10           Awareness, on the other hand, would be like a

11    fan at the Superbowl filming the instant replay shown on the

12    Jumbotron on his cellphone and doing it surreptitiously.  So

13    ATI would film each replay one at a time and every time that

14    the Jumbotron runs a reply, ATI would start a new film.  So

15    there would be 100 replays that would have 100 different

16    films or 100 different sessions and they would transmit each

17    replay one at a time and only after each replay has already

18    been filmed.  And after each replay is transmitted, they

19    would terminate that upload session, resulting in 100 separate

20    upload sessions.

21           So there is no third session for ATI.  They

22    would only invoke this DNS or the second session, if at all,

23    during the first upload because then it would reside in

24    cache, so you wouldn't have it each and every time.

25           If I could have the next slide.

1            So this is claim 9, the only independent claim

2       in the patent.  What they have done as a result of Your

3       Honor's claim construction rulings is they have been forced

4       to come up with a convoluted infringement theory to try to

5       make this reach Awareness' products.

6            The first thing I'm going to talk about is their

7       inability to satisfy the second session.  Again, they rely

8       upon DNS lookup to be this second Internet session.  And the

9       reason that doesn't work is for a couple of reasons.

10           One is if you look at this language, there is

11      a reference to another Internet session and the other IP

12      address or other Internet session, so that immediately raises

13      a question as to whether that is the second session or the

14      third session, which is the second, which is the third?

15           If I could have the next slide.

16           So there is this issue about what is meant by

17      another, what is meant by the other session.

18           Mr. Nettles, for purposes of the '237, tried to

19      equate the other session of the '304 to the second session

20      -- I'm sorry -- another to the second session and the other

21      to the third session.  It is a little confusing.

22           If I could have the next slide.

23           But what Mr. Nettles has said, and this is when

24      it comes to his analysis trying to distinguish the claimed

25      invention from prior art, specifically to the LapLink piece

1    of prior art, he makes the point that you have to read these

2    claims as a whole.  That the second session in 9(b) has to

3    be the same session, second session as everywhere else.

4              So what he is saying there is that the second

5    session for 9(b) is the same second session as in

6    independent claim 1 of the '304 and independent claim 15 of

7    the '304 patent.  That it can't just be any second session.

8    And he acknowledges that in LapLink there is a second

9    session but it does not meet the other limitations, so it

10   can't be the second session.

11             So it can't be just any second session.  The

12   second session has a purpose and it has to be able to do

13   certain things, so one of those particular things that a

14   session has to do.

15             If I could have the next slide.

16             So here in, again, Mr. Nettles' testimony, he

17   makes the point that the second -- there is a requirement of

18   the claim 9 that there be a transfer of data to the other

19   session.  And he says that can be done either on the second

20   session or the third session.  It isn't limited to the third

21   session.

22             So you can transfer that data along the second

23   Internet session or the third Internet session.  He says

24   there is flexibility there.  And one of the reasons he says

25   that is because there is a dependent claim, claim 10, which

1    says that data is transferred during the third session.

2            So when you look at claim 9 and claim 10, it

3    means that the data can be transferred in claim 9 by either

4    the second or the third session.  So the point is that the

5    second session has to be capable of transferring data and a

6    DNS session is not capable of transferring any data from

7    that third session.  The DNS session is just a lookup of to

8    resolve a domain name to an IP address.  It doesn't serve

9    any other function other than that.  So it can't satisfy

10   this aspect of claim 9.

11           Now, another purpose of claim 9 -- if I can have

12   the next set of slides -- of being the second session is,

13   and this is discerned from the specification in claims 1 and

14   2, is that the second session is this gateway session.  It's

15   used to find an available third IP address in order to

16   upload the data and display it.  Because if you had all

17   these customer quick requests coming into one server, they

18   didn't parse them out and assign them to different screens,

19   it would be all jumbled.  You would have to have a different

20   display in order to view all those different customers'

21   requests in real-time.

22           They have to be separated out, so you allocate

23   them an available IP address, say use this one, send it to the

24   server and we'll be able to monitor it in real-time.  That's

25   the gateway function.  It's found in the specification and

1    it's clearly in claim 9.  The second session has to be able

2    not only to upload data from the third session or the

3    monitored session but it also has to be able to do this

4    gateway function.  DNS doesn't do that.

5              If I can have the next slide, please.

6              It's also clear from the specification that this

7    second Internet session is going to the monitored computer.

8    It says it time and time again.

9              If I can have the next slide.

10             It's not something that is going to a third

11   party DNS server.

12             So, again, this up top is the patent, '304

13   patent.  And you can see that the second session and third

14   session both are going to the monitored computer.  And the

15   purpose of that second session, again, is to return to the

16   local computer an available IP address in order to facilitate

17   the display and the real-time monitoring.

18             Whereas in Awareness' case, Awareness' system,

19   what you have is the monitoring sessions to the left between

20   the local computer and the remote computer.  Then you have

21   one session uploading the first information on a delayed basis

22   where you are scraping data after it has been transferred,

23   it's residing in the local computer.  You scrape it, you

24   process it, and then you upload it at intervals to the server

25   farm.

1           There is no display again there at the server

2    farm.  There are just these racks of servers.  And the

3    display comes in a fourth session when a user decides to

4    connect to the cloud and look at stuff that has been

5    previously recorded.

6           If I could have the next slide.

7           Here, again, you can see this is their figure

8    from their patent.  That the first Internet session which is

9    100 and the second Internet session which is 102 are both

10   going to a monitored computer.  One computer, a monitored

11   computer, not to DNS.

12          In fact, there is no mention anywhere in this

13   patent of DNS.  There is no mention of any server other

14   than the monitored computer as being the recipient of the

15   session.  And that is again to facilitate the gateway

16   function and the display function for real-time monitoring.

17          If I can have the next slide.

18          So here again this is ATI's server farm.  It's

19   just stacked, a rack of different servers performing

20   different functions for different purposes, and no display.

21          If I could have the next slide, please.

22          So here again, this is from the specification.

23   This speaks to the purpose of the second session in terms

24   of providing this gateway function, handling a plurality of

25   requests for remote data display and log process.  And

1    having the monitor computer process multiple requests by

2    sending back a network address of an available monitor.

3              So if I could have the next slide, please.

4              Here, again, this is a depiction of that second

5    session.  And the purpose of it is to handle all these

6    different requests from local computers that are coming in

7    at the same time that wanted to have a display and monitored

8    in real-time.  You have to allocate those requests among

9    available displays, and that's why the second session is

10   there.

11             So the next slide, please.

12             So why does DNS not work?  I already said one of

13   the reasons it doesn't work is because it can't convey any

14   data back, per that second session any conveyed data from

15   the third or monitored session.  It's just never going to

16   happen.  We've already established that is one feature of

17   the claim 9(b) it has to be able to do that.  Because you

18   have to be able to do it in session 2 or session 3 given

19   that claim 10 says it's only -- it's the one where it says

20   it's only done in session 3.

21             So DNS doesn't do that.  What DNS involves is

22   you have a domain like Google.com.  You don't have an IP

23   address stored in cache.  And 99.9 percent of the time for

24   Awareness, it's going to be stored in cache.  You are never

25   going have a DNS lookup.  But the one time it is flushed out

1    of cache, if you do have to look it up, it involves multiple

2    sessions to multiple servers in order to resolve that

3    request and return an IP address.  And this is nothing to

4    do with Awareness software.  It is an inherent feature of

5    the Internet.  It is performed by multiple third parties.

6              If I could have the next slide.

7              So here you can see that there are servers

8    in over 380 locations.  They're managed by 12 different

9    organizations.  So this is why we say this is a clear case

10   of divided infringement if you are going to rely on DNS to

11   be the second server.

12             If I could have the next slide.

13             Another reason why DNS does not work for the

14   second session is it is connectionless.  So one of the

15   requirements of 9(b) is you have to terminate the second

16   session.  You have to actively terminate it.  It's a local

17   computer that is opening it up, getting the available

18   network address for the remote monitoring display and then

19   terminating that second session, and then dialing up the

20   third session for purposes of remote display.

21             Well, a DNS connection uses UDP which is a

22   protocol that does not establish a handshake or a connection.

23   It just expires at some point in time.  So there isn't any

24   affirmative termination of that session.  There is no handshake

25   or connection.

1                    If I could have the next slide.

2                    And that is the point of this slide is that

3       given Your Honor's definition that sessions have to have a

4       defined beginning and end, a temporal limitation during

5       which this data, the computers aren't connected and

6       exchanging data, this doesn't fit.

7                    So if I could have the next slide.

8                    And what is interesting is if you look at their

9       figures in the specification, they have this figure here

10      where they're showing the second network address as being

11      www.mec.org.

12                   Well, first of all, that is not -- that is to

13      the monitored computer.  MEC is the monitored computer.

14                   Now, the IP address is stored in cache.  That is

15      going to go to DNS.  That is going to your fourth session.

16      They're going to have to look it up, too.  So it's not the

17      second session.  It's clearly not the intention or object of

18      this invention.

19                   So if I could have the next slide, please.

20                   So in the case of where they don't have it

21      stored in cache or memory, you can see that this would

22      necessarily involved four sessions, a new session 3 of DNS

23      lookup in their case.  Because the DNS was not in the cache,

24      they would have to look it up.

25                   So DNS doesn't work.  It's just a square peg in

1    a round hole.  It can't be this prescribed second session.

2              If I could have the next slide, please.

3              So this is again Dr. Nettles.  He is testifying

4    here.  He is trying to distinguish over prior art.  He again

5    makes the point here that the transfer of data required by

6    claim element 9(c) can be to the second Internet address or

7    the third Internet address.  He also makes the point here

8    that the second session can't just be any second session.

9    It has to provide a certain function and it requires that

10   the session eventually be terminated.  So for all these

11   reasons, DNS doesn't work.

12             If I could have the next slide, please.

13             So I'm going to now turn to concurrence.

14             THE COURT:  Before you do that, why don't we

15   take a little bit of a break.  Then we'll come back.  We

16   will be in recess.

17             (Brief recess taken.)

18             *     *     *

19             (Proceedings reconvened after recess.)

20             THE COURT:  Have a seat.

21             Mr. Moran, you may continue.

22             MR. MORAN:  Okay, Your Honor.  Thank you.

23             So we turn now to the concurrence argument.  And

24   this is one where it began once Your Honor made his *Markman*

25   rulings as to what the definition of an Internet session was.

1              Mainly, that it was a period of time that had a

2    temporal limit, a beginning and an end that involved when

3    two or more computers are connected and exchanging data.

4              That coupled with the construction of the

5    real-time terms really should have ended any accusation of

6    infringement under the '304 patent relative to Awareness'

7    products.  They were put in a very difficult place and they

8    came up with a truncated illogical argument that first an

9    Internet session, the first Internet session can be of

10   some indefinite duration.  It can last days, weeks, months,

11   years, so long as the computers remain on.  And they do that

12   because they're trying to meet this concurrence limitation.

13             The other thing they do is they argue that

14   concurrence means some momentary intermittent overlap

15   between the first session and the second and third sessions.

16             But what the claims talk about is the concurrence

17   is that the second and third sessions have to be concurrent

18   with the first session, not that the first session has to

19   overlap or has some point in time where it overlaps with the

20   second or third session.

21             And the whole reason for concurrence again is --

22   and it has no purpose other than to facilitate real-time

23   monitoring, streaming of data from start to finish.  That

24   is the object, the stated object of the invention.  That is

25   what they're trying to do here.  So claim 9 is a set up to

1    create a platform of three sessions that will facilitate

2    real-time monitoring which is in claim 11 -- in dependant

3    claim 9.

4             So it just doesn't work.  The claims have to be

5    read in terms of the specification.  They have to be read

6    in terms of the claims as a whole and the object of the

7    invention.  And when you do that, it's pretty clear that

8    concurrence is in there in order to allow you to do this

9    real-time streaming and particularly in the third session

10   over the course of that first session.

11            So, again, if I can have the next slide.

12            The way that the ATI software works, it just

13   doesn't have the ability to stream data or do real-time

14   streaming and monitoring.  And that is because data is

15   finished -- when you have a session, data is finished before

16   it's written to a file.  Again, what Awareness does is they

17   record activity from an application that is then written to

18   a file.

19            When the file is complete, it's stored in cache.

20   Then they'll periodically scan the cache to see if there

21   is any new data there.  Then if a new file is found, they'll

22   look to see if there is an appropriate Internet connection

23   to the server, and then that will be uploaded at periodic

24   intervals to the server.

25            But at no time is the recording of uploading

1    of the data done while there is this transfer or while the

2    first session is ongoing.  It's historic data that is stored

3    in the application.

4              So if I could have the next slide.

5              And this is pointed out in terms of these things

6    being mutually exclusive.  So you can see in the top diagram

7    there, this is from Dr. Reinman's report.  You have recorded

8    data, and the transmission is always, there is a period of

9    time before it is transmitted, and what is transmitted is

10   the previously recorded data.  It's always previously

11   recorded data.  You are not getting the alignment between

12   the live data session and transmission.  So there is no

13   transfer of data in real-time with the Awareness product.

14             If we can have the next slide.

15             And one of the reasons that Awareness does this

16   is among the data that they send up during the upload is

17   the duration, the start time and end time of the session

18   that has been previously recorded.  So there is a defined

19   beginning and end to the session, and there is never this

20   concurrence or overlap.

21             If I can get to the next slide.  And if you can

22   continue through that.  The slide I want to get to is the

23   next one.

24             So this is where the concurrence has to be

25   between session 2 and 3 being concurrent with respect to

1    session 1.  That is the patent that is the top diagram.

2    Then you can see they run concurrently or at the same time,

3    simultaneously, session 2 and 3 relative to session 1.

4              Awareness Technologies is in the second diagram

5    here.  As you can see, the first session takes place, and

6    then the second or upload session does not take place until

7    after that first session has ended.  Because it's processed

8    in the middle and they're always sending up prerecorded data.

9              Now, what they have done with their convoluted

10   theory is try to suggest that there is this never-ending

11   session 1 that just keeps going on and going on and going

12   on, weeks, days, years, who knows how long.  And that these

13   bursts, it overlaps with the bursts that are uploads of

14   Awareness data.  But it is never at the same time, the upload

15   is never the same data, never overlapping in real-time.

16             But the important thing here is also that,

17   again, the claims talk about initiating a second session

18   concurrent with the first session.  And what they're trying

19   to do is flip it on its head and say any time the first

20   session is open and with its never-ending session it's

21   always open.  If there is any overlap, where that is going

22   on at the same time that there are these bursts, that you

23   have concurrence.  And it's just not, it's not what this

24   invention is all about.

25             THE COURT:  And why isn't some of this a fact

1   question?  I mean they do have their expert, we have a jury

2   ready to come in.  Why isn't it up to them?

3                    MR. MORAN:  Your Honor, yes.  We took a lot of

4   time in our briefs.  You don't have here separate Rule 56(f)

5   statements of material fact as to which there is no genuine

6   issue.  We took a lot of our briefing pages and laid out in

7   detail these facts and annotated them and provide you with a

8   summary judgment appendix.  They didn't refute that.

9                    So there isn't an issue of fact around how

10  this technology works.  They are simply trying to apply a

11  ridiculous theory to those facts.  But the facts are how the

12  system works and what Awareness does.  I don't think that is

13  in dispute.

14                   So if I can have the next slide, please.

15                   So concurrent.  If you look up the dictionary

16  definition, it's at the same time.  It means simultaneous.

17  It doesn't mean overlapping.

18                   If I can have the next slide.

19                   Here, the synonym for concurrent is synchronous,

20  not asynchronous, and overlapping is asynchronous.

21                   The next slide.

22                   Overlap, you will never find a synonym for

23  overlap where it says concurrent.

24                   If I can have the next slide, please.

25                   This is from their specification.  And it's

1    clear when you look at the specification, and these

2    claims have to be read as a whole, the claims have to be

3    consistent.  Dr. Nettles has said the same sessions for

4    claim 9 have to be the same ones for claim 1, and claim 15.

5    It's all about being able to facilitate the transfer of data

6    in real-time to permit the remote display and monitoring in

7    real-time.

8             If I can have the next slide.

9             Dr. Nettles here, even when he is talking about

10   this, he makes the point that what you need is real-time

11   data as the chat continues, that the third session carries

12   on concurrent with the first session.

13            And that is what they're trying to do.  They're

14   trying to mirror that first session with the third session.

15            If I could have the next slide.

16            This is interesting because this is the

17   specification for the '237 patent where it talks about

18   establishing a third session concurrent with a second

19   communication session.  But then it talks about that

20   session, you can terminate that session and then you can

21   restart it at a later date.  So here is a recognition that

22   if you terminate that second session, you no longer have

23   it concurrent.

24            Next slide, please.

25            This is among the evidence that Dr. Nettles

1    relies on, surprisingly, is testimony from Justin Kagan

2    where he talks about this delayed process for the data

3    scraped from the application and then it's written to a

4    file and it's stored on disk.  And then it's only later that

5    it's uploaded and he describes it as asynchronous and he

6    relies on it in support of his infringement analysis.

7                 Next slide.

8                 This is other testimony that they relied on

9    in connection with their infringement analysis where the

10   testimony of Jason Fitch is where there is at least a three

11   minute interval between the time that something gets written

12   to a file and stored in cache before it is ever uploaded.

13                Next slide, please.

14                So these are some of the points why it doesn't

15   work.  Because the recorded data -- actually, let's go to the

16   next slide.  It's a little clearer.  Next slide after that.

17                So the elements that are the met.  ATI does not

18   participate in a first Internet session.  It's not actually

19   capturing data as it's being transmitted.

20                The next slide, please.  No.

21                So it don't have these concurrent sessions.

22   It's only data uploaded in an asynchronous way and never at

23   the same time as the session that it's monitoring, the

24   real-time session.

25                The next slide, please.

```
 1                    So the missing elements, again, ATI doesn't

 2       participate in the first session.

 3                    It's only capturing data after it has been

 4       exchanged or conveyed.

 5                    It scrapes the data from the applications.

 6                    It does not do any streaming of data

 7       concurrently during a concurrent first and third session.

 8                    Next slide.

 9                    9(b).  Doesn't have these concurrent sessions.

10                    Neither the first, nor the second sections are

11       initiated concurrently with the first session.

12                    They don't run continually or concurrently with

13       that first session.  There is a little burst, they stop,

14       they end.

15                    And there are multiple bursts.  There is not one

16       long continuous third session that tracks simultaneously or

17       at the same time as the first session.

18                    As a result of which there is no real-time

19       monitoring.

20                    Next slide.

21                    And, again, going back, you are not missing the

22       three sessions.  There is no second or gateway session.

23                    The DNS does not qualify.

24                    It's not directed to monitoring the computer.

25                    It does not do any load balancing.
```

1          It is not capable of transferring data with that

2    first Internet session back.

3          It doesn't terminate.

4          And it would also result in divided infringement.

5          THE COURT:  So I mean let me come back to my

6    question because we're going to hear from plaintiff and

7    they're going to talk about Dr. Nettles.  While there may

8    not be a dispute as to how the system works, there is a

9    dispute as to how and whether the claims as construed map on

10   to that system.  Why is that not a genuine disputed material

11   fact that I need a jury to resolve?

12         MR. MORAN:  Because in order to reach that

13   conclusion, you have to buy into these erroneous premises

14   that a DNS can qualify as a second session.

15         THE COURT:  So what about the inventor's example?

16         MR. MORAN:  That concurrence means momentarily

17   overlap.

18         THE COURT:  Hold on.  Dr. Nettles I think opines

19   that a DNS session can be the second session.  I may have

20   said it incorrectly, but are you saying he doesn't even

21   express that opinion?

22         MR. MORAN:  No, he does.  But it's flat wrong

23   relative to the meaning of the claim.  And the way that

24   they're construing the claims are not consistent with their

25   plain meaning in the context of the specification and the

1    claims as a whole.  And the only --

2              THE COURT:  Okay.  Hold on.  The question is,

3    you're of that view, your expert is of that view, their

4    expert is not of that view, and I'm still at a loss as to

5    why that is not a question.

6              MR. MORAN:  Because the claim construction rests

7    within your province, Your Honor.  And you have the ability,

8    looking at these claims, to say it just can't work the way

9    that they say.  They have come up with this convoluted

10   theory to try to reach these accused products and they have

11   been doing handstands and gymnastics.

12             THE COURT:  There is no point of law that says

13   they're not allowed to do handstands or have a convoluted

14   theory.  If they have an expert who says I'm applying the

15   Court's claim construction, and this is how I think the

16   defendants' product fits in it, that sound like a triable

17   issue.

18             MR. MORAN:  It's not because they're misapplying

19   those claim constructions.  And they're trying to fashion

20   a theory that is not grounded in the actual way in which

21   Awareness operates and functions.  Those are established

22   facts.  There is no dispute about that.  We took the time to

23   put that evidence in.  It's uncontroverted.  And when you

24   look at that, it's a square peg in a round hole.  So, Your

25   Honor can reach that decision on summary judgment.  That

1    these claims as properly construed don't, these don't fit

2    these accused products.

3            That is why we're here on summary judgment.  You

4    can't advance an untenable theory and just because you have

5    an expert who adopts it, particularly where he plays fast

6    and loose in this kind of fashion and misstating ATI's

7    technology as it's certified.  It doesn't recognize specific

8    facts in the way in which the accused products work which

9    are uncontested.  It's clearly ripe for summary judgment in

10   that situation.  And there are plenty of cases that brief

11   summary judgment on noninfringement for precisely that reason.

12           THE COURT:  Okay.

13           MR. MORAN:  Thank you.

14           THE COURT:  Thank you.  We'll hear from plaintiffs.

15           MR. CONNOR:  Good afternoon, Judge.

16           THE COURT:  Good afternoon.

17           MR. CONNOR:  These are the four issues that were

18   raised by the defendants' summary judgment motions.

19           There is one other that is not listed here, and

20   that was the one that Mr. Moran began with that pertains

21   to claim step 1(g) of the '237 patent.  That was not the

22   subject of briefing but I will go ahead and do my best to

23   address it at the end, Your Honor.  But I'll tick through

24   these four issues and summarize the high points of the

25   evidence that Dr. Nettles and the plaintiffs are relying on

1    to show infringement and that, in our view, establish a

2    triable issue of fact on each.

3             With respect to the DNS -- I'm going to jump

4    around just a little bit.  But let's talk about the DNS as

5    the second session issue first, which is this No. 1 here.

6             I guess I can do it from here.

7             Great.  Let me say one thing at the outset

8    because this has been mentioned once already today.  It was

9    mentioned a couple weeks ago on the telephone, and I want to

10   conclude it right now.

11            The theory that the DNS lookup session that is

12   initiated by the user computer satisfies the second session,

13   the address session was disclosed in the plaintiffs' 2013

14   May infringement contentions.  That is where this is

15   started from.  So this is not a situation where there was a

16   change of infringement contention following Your Honor's

17   claim construction opinion or any other change in the case.

18   This has been the issue from the get-go, and the issue has

19   been joined by the parties from the start.

20            Now, the briefing and what we heard defense

21   counsel talk about today really focuses on whether UDP, user

22   datagram protocol, can be a protocol used for a communication

23   session, Internet session.  And that argument was made at

24   *Markman* by the defendants, in fact, because the defendants

25   had originally proposed a construction limited to TCP/IP,

```
1    and the plaintiffs pointed out that was factually incorrect

2    because UDP is an Internet protocol.  There is no dispute

3    there.  And it could be a protocol used for these specific

4    Internet sessions.

5              This is an excerpt from the hearing that Your

6    Honor conducted where defense counsel details why a UDP

7    session has a beginning, has an end, and can satisfy the

8    session requirements of the claims.  This is opposite of the

9    position that the defendants are now taking on DNS because

10   DNS uses UDP.

11             Just to be clear, this is the position the

12   defendants took at Markman that you can use UDP for these

13   sessions and it's irrelevant that there is any.  This is

14   what they say right here.  It's not relevant that there be

15   any difference.  Both will be covered.

16             To the extent there is any dispute at the

17   Markman hearing, we had a combined hearing, of course.

18   Awareness did adopt the arguments and the positions that

19   SpectorSoft set forth so I wanted to make that clear.

20             Now, Dr. Reinman, defendants' expert relies on

21   DNS himself to satisfy that second session in his validity

22   analysis.  What we're hearing today is that for infringement,

23   Awareness says you cannot rely on DNS, it's fundamentally

24   different, but on validity, Dr. Reinman says there is really

25   no dispute about how DNS works.  He says it does exactly
```

1       what the second session performs, the address lookup.   And

2       he even says it's just like connecting to any other website.

3                So the defendants are taking the position and

4       their expert, in the record, says DNS can satisfy the second

5       session.  Again, contrary to what we've been told today.

6       This is from Dr. Reinman's expert report where he explains

7       how the DNS address translation, if that delete describes

8       the second Internet session.

9                This evidence certainly demonstrates that the

10      experts may have a disagreement now.  Certainly, we'll

11      cross-examine Dr. Reinman on this position at trial.

12               Now, does ATI use DNS?  We didn't hear a lot

13      about the divided infringement issue.  I don't know if that

14      is being dropped, but I'll go ahead and just address it for

15      Your Honor.

16               ATI certainly relies on it.  They use it to

17      resolve the name of the Awareness servers.  This is an excerpt

18      from their manual referring to how DNS is required to do

19      exactly that.  So the second session, that lookup session

20      is something that ATI relies on DNS in their product, and

21      Dr. Reinman relied on for his opinions.

22               I'll talk now about concurrence.

23               Now, concurrence is, as Mr. Moran, said relating

24      to the real-time objective in the patent.  We also heard

25      that that is a reason why the concurrence element or step is

1    not met, a requirement under the claim, because Awareness

2    does not do any real-time monitoring.

3              Well, the evidence shows otherwise, not to

4    mention their own argument to the Court in briefing which

5    suggests that either the accused products do not upload

6    until the first session terminates, which I think is the

7    argument we heard today, but they also said to the Court

8    that the upload session terminates immediately upon upload

9    and prior to the termination of the first session.

10             So by their own argument here, we've got

11   concurrency, and we're going to show you in a moment their

12   own CTO admits as much.

13             So, again, as we heard today, Awareness does not

14   really try to do real-time monitoring, except that they do.

15   And they have advertised this for a long time.

16             This is from their WebWatcher consumer product.

17   It talks about how they monitor key strokes in real-time from

18   anywhere.  And for their activities that they're monitoring,

19   they do seek to do this in real-time.

20             The concurrence requirement of the claims is

21   met by Awareness, and it's important to them.  Here is some

22   evidence that demonstrates that.

23             Mr. Fitch is a former CTO of Awareness.  We

24   talked to him in 2013 and asked him:  Do these sessions

25   overlap?  Is the upload -- if you have an upload session or

1    you have a first session, a monitored session -- which

2    because it's consistent with the specification, we'll talk

3    about that in being the chat session.  If you are chatting

4    along, say for 15 minutes, are you going to have an upload

5    session during that time?

6              And he says:  More than likely, yes.

7              Now, the argument that those bursts of upload

8    data are separate sessions is premised on Awareness'

9    argument that has been addressed by the Court, heard by

10   the Court in the SpectorSoft case as well.  That TCP is

11   the only protocol that is covered by the claims.

12             We looked just a moment ago at some of the

13   argument by the defendants where, at *Markman*, to support

14   their proposed construction, which was substantially adopted

15   by the Court, they said UDP also along with TCP would also

16   be within the scope of the claims.

17             The position they take now is only TCP is within

18   the scope of the claims because they can point to TCP flags

19   that mark the beginning and end of each of those bursts.

20             But the Court's claim construction for "session"

21   doesn't say anything about TCP.  It doesn't say anything

22   about bursts of uploads.  It says that a "session" is a

23   single continuous period of time during which two computers

24   are connected and exchange data.  And they can exchange data

25   and be connected for an extended period of time because the

1   applications on either end are maintaining that state.

2            That's what Awareness does.  That is why they

3   have a continuous session that encompasses all of those

4   uploaded bursts.  That's what Dr. Nettles explained in his

5   report and at his deposition.

6            Now, it's incorrect what we saw a few moments

7   ago from Dr. Reinman that it's impossible to upload data

8   during a first session, a monitored session.  As Mr. Fitch

9   testified, it's likely to happen in a 15 minute span.

10  Dr. Nettles tested the Awareness products, concluded that

11  and observed that it did do that, and put that opinion in

12  his expert report.  There is a fact issue about concurrence.

13           THE COURT:  Let's talk about that for a minute

14  because I think Mr. Moran's position seems to be that there

15  is no fact dispute about how this system works.

16           Everybody agrees how the ATI system works.  Is

17  that correct?

18           MR. CONNOR:  I would not agree with that, Your

19  Honor.  I think there are some disagreements about how

20  specific things work.  And when Mr. Moran made the argument

21  to Your Honor, there is a premise about what the claims mean

22  that the parties have a disagreement on.  And we can look at

23  them on claim 9 of the '304 here.

24           The claim says that concurrent with the first

25  session -- so the first session is the chat session, for

1    example -- concurrent with that session, you initiate

2    another session.

3              And this is a nested claim.  It's a little bit

4    awkward to read, but what happens is you step down from

5    (b) and you see that step (b) includes the following steps.

6              So the way I think it's handy to look, imagine

7    there is, at (b) there, you just take those other three,

8    four steps and pretend that they were drafted right there.

9              So concurrent with the first session, chat

10   session, you initiate the second session, you receive an

11   address, you terminate the second session, and you initiate

12   a third.  And then you go back up to (c) and you transfer

13   data associated with the first session to the other IP address.

14             So what Mr. Moran describes was the requirement

15   that is not in the claim that there be concurrence of all of

16   these sessions and that is not what the claim requires.  The

17   claim requires that there is initiation of those second and

18   third sessions during, concurrent with, the first session.

19   So there has to be some contemporaneous initiation.  It all

20   has to happen at the same time on a time scale but there

21   doesn't have to be total overlap or congruence on the time

22   scale.

23             THE COURT:  So one of the slides Mr. Moran

24   showed, I think it was from the expert report, but it showed

25   clear demarcation, some space between when a first session I

1    think ended and a second or third session began.  How

2    should I understand that?  Is that the experts disputing

3    in a genuine way how the accused system actually works?

4                MR. CONNOR:  I think that is a scenario where

5    you would have a chat session that perhaps only lasted for a

6    few minutes and the default upload period in the Awareness

7    products is four minutes.  So if you were chatting for two

8    minutes, for example, it's conceivable that you could have a

9    first session, a break where there is no chatting, and then

10   the initiation of the second and third session.  And in that

11   scenario, the method would not be performed.

12               THE COURT:  So there is a four minute default.

13   That is not in dispute.  Correct?

14               MR. CONNOR:  Correct.

15               THE COURT:  The scenario where it's a two

16   minute chat as the first session, would not be practicing

17   the method, would not infringe, that is not in dispute;

18   correct?

19               MR. CONNOR:  That's right.

20               THE COURT:  If I play it out through all the

21   conceivable scenarios, am I going to end up with a dispute

22   over simply how the claims apply or do you think this record

23   reveals again a dispute as to how the ATI products actually

24   work?

25               MR. CONNOR:  In that scenario where you have

1    differing times, different conditions when a new product is

2    being used, I don't think there is any dispute about how the

3    system operates.  There are certain configurations that can

4    be modified and there are certain things that happen when

5    the system is not in operation as Dr. Nettles explored when

6    he tested it.  But, fundamentally, the description of the

7    system and how it works I think is very close to what Mr.

8    Moran and his expert, Dr. Reinman and Dr. Nettles agree on.

9    Dr. Nettles did the code analysis so he went a few levels

10   deeper to confirm that, but basically I think generally we

11   can agree that this is how it works.

12            What the disagreement seems to really focus on

13   is, well, under these circumstances, it doesn't perform

14   every step.  While that may be true, that is not an issue

15   of whether it infringes.  That is an issue of whether it

16   infringes all the time or some of the time.

17            THE COURT:  To the extent it's also an issue of,

18   is it fair to really say that this is a first session still?

19   Let's say if it runs forever.  Infinity was on one of the

20   slides.  Maybe that is convoluted.  Is that a question for

21   me on summary judgment or is that a question for a jury as a

22   fact finder?

23            MR. CONNOR:  I think that is a question for the

24   jury as a fact-finder.  I have a teenage daughter.  I think

25   her chat session lasts longer than four minutes generally.

1    I think that is a question the jury is going to hear when

2    the jury hears from Dr. Nettles here is how I tested the

3    product and here is how -- there is nothing that stops,

4    interrupts the chat session, the first session, nothing

5    about the ATI software that interrupts that session.  We'll

6    hear testimony from RemoteCOM who uses the software and

7    they monitor parolees and probationers for as long as they

8    are using it.  They sit in front of the computers for long

9    extended periods of time.  You will hear testimony about

10   that in person.

11          So the fact issue of how often and under what

12   circumstances goes to do they infringe or the frequency of

13   infringement, not to whether the software, as used, directed

14   by Awareness, practices the method.

15          THE COURT:  What about the argument that the

16   objective of the patent is some sort of real-time monitoring?

17   I know you showed me your advertising you think indicates that

18   they do real-time or at least concurrent monitoring, but is

19   that a concept that is pertinent to my analysis on summary

20   judgment?  If I get it from the specification, there is a

21   subjective, does that have some sort of impact on the analysis

22   I have to undertake?

23          MR. CONNOR:  The intent of the inventors is not

24   a limitation on the claims.  And so to the extent that that

25   is already baked into the Court's claim construction and the

1    Court heard those arguments on claim construction, we have a

2    construction, but under the construction now for infringement,

3    We are bound by that construction and must apply that

4    construction, those claims as construed against the products

5    to determine whether they meet them.  So the objective and

6    the intent of the inventors is not relevant to that inquiry,

7    Your Honor.

8                    THE COURT:  Thank you.

9                    MR. CONNOR:  Let's talk about the '237 in the

10   time that I have left, Your Honor.  I do want to address,

11   as I said, it's not in their briefing because this issue

12   is not raised by the defendants, but the doctrine of

13   equivalents argument.  We did assert doctrine of equivalents

14   infringement, that theory of infringement in this case.  We

15   dropped that, of course, following the prosecution history

16   estoppel opinion from the Court.

17                   Awareness infringes directly the '237 patent.

18   And they're different than the defendant in the related

19   case.  The defendant in the related case had distinct server

20   components, and that is not what Awareness has here.

21                   You heard a reference to the virtualization of

22   the servers, but what is special here is that there is one

23   address, one for commercial and one for consumer, that all

24   of the server requests funnel through.  And the claim step

25   1(g) requires transferring at least part of the conveyed

 1    data to the address via the second session.  Okay?

 2           Now, the evidence that Dr. Nettles has in his

 3    report, let's cover that real quick.  We're going to pull

 4    that up in a different document.

 5           Here is the evidence that Dr. Nettles presents

 6    in his report.  So the record is clear, this is in the

 7    summary judgment record at Docket Entry 254, Exhibit 23 is

 8    where this document can be found.  So this is the evidence

 9    that Dr. Nettles put forth in his expert report that shows

10    direct infringement of the '237 patent claims.

11           It's not accurate to say I think I may have

12    heard that only a doctrine of equivalents analysis was set

13    forth in his report.  That is not true.  Here is his direct

14    infringement analysis.

15           So we've got step (g).  We'll go to the next page.

16           There is testimony here from Mr. Kagan.  He is

17    one of the software architects at Awareness.  In fact, I

18    think he is the software architect for the Awareness product.

19           So here is what he said.  I asked him:  Is this

20    how it works?

21           And this quote that I read to Mr. Kagan comes

22    from one of SONAR'S, one of Awareness' documents showing

23    their general overall architecture.  And I am going to put

24    it up here for a moment because I think it is helpful.  It

25    shows why this argument -- I have a copy for Your Honor.

1                    THE COURT:  You can pass it up.

2              (Document passed forward.)

3                    MR. CONNOR:  Mr. Kagan agreed that this is an

4      accurate description of how the system works.  And I read

5      the text that we can't really see on the screen there.  That

6      is what the quote is in the question that we're going to

7      look back in a second.

8                    But I want to put this up because it relates to

9      another issue that we heard about with respect to the '237

10     and whether it's operating at the network layer or the

11     protocol layer and where it gets the data or where it's

12     monitoring the data.  Because the defendants have taken the

13     claim to mean that you can't satisfy '237 if you monitor

14     at the application.  You must, in other words, monitor

15     when the information is on the wire.  Essentially, it's a

16     location argument.  So you've got to do the monitoring at

17     a particular location.

18                   This is how Awareness describes its own SONAR

19     desktop agent.  It sits right there in between all of these

20     other modules that are, as Mr. Moran describes, scraping

21     data from the applications or going through that SONAR

22     desktop agent just like the CCM in the '237 patent, Figure

23     1.  The information is funneled through that agent.  It

24     looks at it.  It decides whether it can go.  It monitors.

25     It blocks, for example, URL requests.

1            Mr. Kagan confirmed that that is exactly how

2     it works:  Yes, in a very general sense.  That's the first

3     piece of evidence because that shows that the data is going

4     from that desktop agent up to the server.

5            We asked him more specifically.  Let's take the

6     example datasonarcentral.com.  This is one of the Awareness

7     servers.  And we asked him how does this work?

8            And without going into too much detail about

9     this, what is important to note is that Awareness has these

10    what are called virtual, virtualized servers.  They're all

11    in the same physical box.  It's like a way of organizing and

12    load balancing.  And what is behind that address?  What is

13    behind the point where all of these requests come from the

14    clients?  That is really, it's invisible to the user.  We

15    weren't able to test that because we don't have access to

16    Awareness' servers, but what we do know is that all of the

17    requests go to the same place.

18            And Mr. Fitch confirmed this.  He said:

19    Switches in front of the load balancer, they come in and --

20    can you scroll down?  And he said it goes effectively to one

21    physical server and within that there are virtual servers.

22            I think it's also worth noting he said that the

23    configurations in the claim of the '237 Patent requires

24    that the uploaded data goes to that server and the access

25    configurations come down.  And he said, he confirmed, yes,

```
 1    the configurations for the clients are on the servers, and

 2    he says it is the same virtual servers we were discussing.

 3             So Dr. Nettles confirmed as best he could.  He

 4    didn't have access to the back office at Awareness but

 5    looking at the trace data, looking at the operation of

 6    the system and this information from the testimony of the

 7    Awareness architect, here he concluded, in his opinion, that

 8    that claim element is met literally.

 9             Scroll down one more.  There is another piece I

10    think that is worth mentioning.

11             Those configurations are stored in a database on

12    the server, but the claim doesn't distinguish between where

13    they're stored.  It only claims the request and where the

14    data is sent.

15             Lastly, Dr. Nettles notes that when you go online

16    and you access the stored data, so I'm monitoring my teenager

17    and I want to see where she has been going.  I can log in

18    and I can see the websites where she visited, how long she

19    has been there, and all this other data.  That login address,

20    by the way, it's the same server.  It's the same address.

21             THE COURT:  So defendants I think are of the

22    view that you have at some point conceded that 1(g), this

23    element, is not literally present.  Evidently, at least

24    today you don't concede it, but what is your response to

25    the argument that you conceded it previously?
```

1                    MR. CONNOR:  I disagree.  I'm puzzled where that

2       might come from.  We've never conceded that this claim step

3       is not met literally.

4                    THE COURT:  You do concede that you can't

5       meet it through the doctrine of equivalents based on the

6       prosecution history estoppel?

7                    MR. CONNOR:  Correct.  Yes, Your Honor.

8                    THE COURT:  Is there anything else you want to

9       say on this motion?

10                   MR. CONNOR:  No, Your Honor.  Thank you.

11                   THE COURT:  Okay.  We'll hear rebuttal.

12                   MR. MORAN:  Your Honor, as I said, we painfully

13      took time to lay out the facts in our briefs with annotated

14      citations.  It was incumbent upon them to meet those facts

15      if they disputed them, and they haven't done that.

16                   And when he relies on this chart here, Mr. Fitch

17      said that is not accurate.  He didn't agree with them.  And

18      this is the evidence that they cite.  He didn't agree with

19      them because the servers, while in the same place, they're

20      separate servers performing separate functions with separate

21      network addresses.  This claim has 7 steps, requires three

22      different network addresses, and for certain things to

23      happen at each of those network addresses, and so you can't

24      just lump these servers together the way they're doing it.

25      They're all in one place.  That was the doctrine of

1    equivalents argument.  It can't be bootstrapped now to argue

2    literal infringement.

3            So I think this is a case where you can reach

4    summary judgment.  The facts are not in dispute.

5            THE COURT:  Evidently you have ten minutes left

6    for all your remaining motions.

7            (Mr. Moran starts to return to counsel table.)

8            THE COURT:  But I didn't mean to scare you away.

9            MR. MORAN:  Well, it's just -- and then when

10   he talked about concurrence, he is relying on overlap.  And

11   that is the problem with his argument, because it is not

12   consistent with the claims.  The claims and the construction

13   of the claims rest with Your Honor.  You have to apply these

14   facts to those claims.  That is why summary judgment is

15   appropriate here.

16           There are plenty of cases where summary judgment

17   is reached on noninfringement based on claim construction

18   and the application of facts to those claims, and that is

19   what this is here.  Clearly, when he acknowledges there is

20   a four minute gap, he used the term "overlap" and that is

21   the problem.  Overlap is not concurrence.

22           "Concurrence" wasn't construed at the *Markman*

23   hearing so it has to be construed now because it's clearly

24   an issue, and its plain meaning means simultaneous, at the

25   same time, which is consistent with the purpose of this

1    invention.  The specification, it talks about concurrence

2    as facilitating real-time monitoring from start to finish

3    of that first session.  It's concurrent, the second and

4    third session being concurrent with the first, not the first

5    having to overlap here or there evidently with the second or

6    third.

7                    Thank you, Your Honor.

8                    THE COURT:  Thank you.  We'll let the plaintiff

9    choose the next motion to argue, please.

10                   MR. CONNOR:  We'll talk next, Your Honor,

11   about Docket 221, which is the plaintiffs' motion to exclude

12   certain opinions from Dr. Reinman, the validity expert.

13                   It's a rather simple issue.  Dr. Reinman generated

14   an opening expert report.  He provided his analysis and con-

15   clusions about a set of prior art that had been asserted by

16   the defendants, identified their validity contentions.  And

17   we responded, Dr. Nettles responded to that report.  And then

18   on the date for the reply report, Dr. Reinman submitted a

19   supplemental report and it includes some information, has new

20   information in it that we're not challenging even though it

21   was new, but we are challenging the substantively rather large

22   set of new opinions which are not Dr. Reinman's own opinions.

23                   What Dr. Reinman did is he said I've now

24   received Dr. Cohen's expert report.  It has new argument,

25   new art I never considered, new opinions and analysis that I

1    never considered.  I'm going to adopt it.  And that is what

2    he did.  He literally adopted all of the evidence or all of

3    the opinions, analysis, and conclusions that Dr. Cohen had

4    put in his opening report.

5              We asked Dr. Reinman, well, where is your

6    analysis?

7              And he said:  I'm just embracing all of what

8    Dr. Cohen did.

9              We said:  Are you going to do any of your own?

10             And his answer was:  I didn't think I needed

11   to because Dr. Cohen had already done that, and it's in the

12   record.

13             It's not in the record, in the expert report

14   record in this case.  And we think it's problematic for

15   several reasons.

16             First of all, the law does not recognize that

17   an expert can opine about opinions that are not his own

18   except under certain circumstances.

19             One of those circumstances is discussed in

20   the Advisory Committee Notes Rule 703 where it talks about

21   a doctor, a specialist who needs to reach a diagnosis, make

22   a diagnosis, and he does so based upon information that

23   he receives from another specialist, nurses, technicians

24   who conduct some tests.  He gets all of that information

25   together, and then, importantly, he forms his own opinions

1    based upon it.

2              What Dr. Reinman did here is he skipped the

3    middle step.  He did no analysis of his own.  When we asked

4    him where his analysis is, he said:  Well, it's all in my

5    report at pages 30, 31, and 32.

6              So this is what those pages show:

7              Here is what I got since my report.  Based on my

8    analysis of those materials, conclusion 1, it is my opinion.

9    Next page is conclusion 2, and conclusion 3, and it goes on

10   to conclusion 5.

11             There is no analysis, Your Honor.  It's simply a

12   wholesale adoption.  The cases talk about this in terms of an

13   expert being merely a mouthpiece or parroting the opinions

14   and testimony of an undisclosed expert or a witness who is not

15   subject to cross-examination and wasn't disclosed in this

16   case.  Importantly, it's just rank hearsay, Your Honor.

17              The rule doesn't allow that.  The rule doesn't

18   allow an expert to do what Dr. Reinman did here.

19             He said I took the Freund report, which is

20   Cohen's, and I put my conclusion on it.  That is what

21   Dr. Reinman did.  He did zero analysis.  He missed the

22   beginning.  I mean he took the beginning which is Cohen

23   stuff, he came up with a conclusion that he put on Dr.

24   Cohen's opinion but he didn't do any analysis at all.  That

25   cannot support those conclusions.  And he should not be

1  allowed to testify about it.

2          Rule 703 allows experts in certain circumstances

3  to testify about other expert's opinions but it did not,

4  as the recent case in the Eastern District of Pennsylvania

5  notes, did not abolish the hearsay rule.  You can't just

6  import wholesale somebody else's testimony and skirt hearsay

7  by adopting it as your own, but yet that is exactly what he

8  has done.

9          So I'm going to stop now, Your Honor.  I think

10  the point is made clear.  There are some cases that we cite

11  here where it talks about problems with that, why there is

12  real harm.  We're not able to cross-examine Dr. Cohen.

13  The soundness of Dr. Cohen's opinions have been called into

14  question in the SpectorSoft case.

15          Of course, we have serious concerns about the data

16  and the conclusions that Dr. Cohen reached.  Importantly,

17  when we asked Dr. Reinman about Dr. Cohen's opinions and his

18  analysis, at first he said he adopted it.  Then, when we

19  delved into it, he actually walked back and he said, well, of

20  course, I have never talked to him.  I don't even know what

21  kind of claim construction he applied or what he looked at.

22  We couldn't effectively cross-examine Dr. Reinman even on the

23  underlying opinions and analysis that he wanted to embrace.

24          Finally, he even disagrees with Dr. Cohen.

25  Dr. Cohen, by the way, also opines that DNS can meet that

1    second session.  When we pointed that out to Dr. Reinman, he

2    said, oh, yeah.  I think I disagree with Dr. Cohen on that.

3            So what we're left with is Dr. Reinman saying I

4    want to testify about all of these opinions from Dr. Cohen,

5    yet we cannot even effectively inquire of that.  And based

6    upon this, we have serious concerns about what his real

7    opinions are.

8            So we think that should be excluded.  It still

9    leaves his original opinions in this case.  We're not

10   challenging his testimony completely on validity.  He has

11   developed opinions and claim charts he can testify about.

12           We don't think he should be able to testify at

13   trial about opinions that are somebody else's.  It's going

14   to be very confusing for the jury, Judge.

15           THE COURT:  Why doesn't his rejection of

16   Cohen's opinion on this last point indicate that when he

17   says these are my opinions, I got them from Dr. Cohen but

18   these are now my opinions, why doesn't this all at least

19   make it reasonable that a fact-finder could perhaps rely

20   on his analysis, that is, his opinions and analysis?  That

21   is, he didn't just wholesale adopt it.  You have just

22   shown he actually disagreed on at least one point.

23           MR. CONNOR:  He only disagreed on this point

24   after we spent a fair amount of time at his deposition going

25   through it.  Dr. Reinman was not at all familiar with the

1    actual report that he was relying on, he said he adopted,

2    so it took a fair amount of time in answering the first

3    question that we asked of him.

4          So it's still your opinion that his analysis

5    here is correct?

6          And then he said, under my interpretation of the

7    construction, I wouldn't do that.

8          So what we didn't have the opportunity to do

9    is go through all of the more than the 1,000 pages of Dr.

10   Cohen's opinions and charts -- his charts went up to R, I

11   think, on different theories -- and to sit there and go

12   through that with a fine-tooth comb with Dr. Reinman to know

13   exactly what he does and does not adopt.  So we're left with

14   a very confusing situation.

15         So if the jury hears about Dr. Cohen who is not

16   going to be here and Dr. Reinman agrees with some of his

17   opinions and not with others, Dr. Cohen is never going to

18   be here, subject to cross-examination in this case.  We're

19   worried the jury is going to be terribly confused about who

20   the experts truly are and whose opinions are credible.

21         THE COURT:  All right.  Thank you.  We'll hear

22   from the defendants.

23         MR. DONLON:  Mr. Donlon, Your Honor.

24         Might I inquire of your assistant how much time

25   is left.  I'm going to be short.

```
1                    THE LAW CLERK:  One second.

2                    THE COURT:  We won't charge you for this time.

3       Don't worry.

4                    MR. DONLON:  I'll proceed, Your Honor.

5                    THE COURT:  It's something under ten minutes.

6                    MR. DONLON:  I understand that, Your Honor.

7       Then I will be very, very brief.

8                    All we're talking about here is --

9                    (Law clerk holds up eight fingers.)

10                   MR. DONLON:  Thank you.

11                   All we're talking about here is one section

12      of the supplemental report.  We're not talking about the

13      rebuttal actions.  We're also not talking any more about

14      the motion, that we couldn't consider Dr. Reinman's opinion

15      about Pearl Software software code.  That the plaintiffs

16      are no longer objecting to that.

17                   So now we're down to the question of whether

18      or not Dr. Reinman should be allowed to give an opinion as

19      to whether LapLink and Omniquad are prior art.  That is all

20      he's adopted.  He has not adopted 1,000 pages of Dr. Cohen's

21      testimony.  And prior art can come from a document itself.

22                   Dr. Reinman testified that he looked at the

23      product materials for these two items, that he did his own

24      independent verification, and he agreed with the conclusion

25      that Dr. Reinman reached that these two items represented
```

1    prior art.  That is all this motion is about.  Based on

2    Dr. Reinman's testimony and his deposition, that he did an

3    independent verification, he did an independent analysis.

4            The depth of that analysis is an issue that

5    goes to weight.  If they wish to cross-examine Dr. Reinman

6    concerning what did you do with the analysis and they want

7    to demonstrate that he didn't do enough and he looks bad in

8    front of the jury, that is an issue as to weight.

9            The question here is should that testimony, that

10   limited area of his testimony be excluded?  Our position is

11   it should not.

12           THE COURT:  It's clear that he did not speak I

13   think to Dr. Cohen or at least not before he formed his

14   opinion.

15           MR. DONLON:  He did not speak to Dr. Cohen.

16   However, he testified he did understand Dr. Cohen because

17   he had Dr. Cohen's complete report.  So this is not the

18   case, as one of the cases cited, where the expert had no

19   idea how the other person did his analysis.  He had the

20   complete analysis in a written form.  He simply didn't speak

21   to Dr. Cohen about it.

22           THE COURT:  And if Dr. Cohen isn't here, why is

23   this not hearsay?

24           MR. DONLON:  Because when he testifies, he will

25   only be testifying to is LapLink and is Omniquad prior art.

1    And based on my analysis, I believe that they're prior art,

2    AB&C.

3              THE COURT:  Do you expect him to even mention

4    Dr. Cohen and Dr. Cohen's opinion?

5              MR. DONLON:  He would not be required to, Your

6    Honor.  He certainly does not have to because his testimony

7    is he has an independent opinion on this point.

8              THE COURT:  Okay.  Thank you.

9              MR. DONLON:  Thank you, Your Honor.

10             THE COURT:  Is there any rebuttal?

11             MR. CONNOR:  The problem with that proposal

12   that we heard is that there is no analysis.  What I showed

13   on pages 30, 31, and 32 is what Dr. Reinman admitted is

14   the totality of his analysis.  There is none.  It's mere

15   conclusions.

16             So this is a matter of fundamental unreliability

17   because there is no analysis on which the plaintiffs and

18   the Court can examine and probe and determine reliability.

19   There is simply a complete vacuum there.

20             THE COURT:  Is it right that at this point, the

21   only issue in this motion is whether he can opine these two

22   particular things, LapLink and Omniquad are prior art?

23             MR. CONNOR:  There is a third.  It is the '611

24   patent, Your Honor.

25             THE COURT:  Whether that is prior art as well?

1            MR. CONNOR:  All three of those.  Well, just

2    opining that they are a prior art is not what he wants to do.

3    He want to opine that they're prior art that invalidates and

4    render obvious and all of that other stuff.  That requires

5    him to do some analysis and he has done zero.

6            THE COURT:  Did he tell you that he looked at

7    them and made his own conclusion?

8            MR. CONNOR:  He did not look at the products.

9    He claims to have read some of the materials, but those are

10   the materials that were in Dr. Cohen's report.  And when

11   we asked him:  Where are the materials on your materials

12   considered that you looked at?  They weren't there, Judge.

13   They weren't even listed on the materials considered.  It

14   was a 100 percent reliance on the Dr. Cohen report,

15   including Dr. Cohen's materials considered.  There is simply

16   nothing there.

17           When we showed this, pages 30, 31 and 32 from

18   Dr. Reinman's report, that is everything.  We had nothing

19   more.  There is no analysis from him, no nothing.

20           It's worth noting also, Judge, that Dr. Cohen

21   submitted a reply report after this.  All they have is the

22   OPM report from Dr. Cohen because the reply report may be

23   designated confidential.  And I don't know if he received a

24   retainer from SpectorSoft.

25           But Dr. Cohen, himself changed his opinions.  He

1    modified them and he changed some of his theories.  We

2    discussed this in the SpectorSoft case.  But he clarified

3    some of his opinions in a substantial way in his reply

4    report.  And I'm not taking shots at Dr. Cohen because

5    we're dealing with all of that, but that is not even in

6    the record in this case.

7                 Certainly for the plaintiffs to effectively

8    probe and analyze whatever Dr. Reinman claims to have done,

9    if he is relying on the totality of what Dr. Cohen did,

10   then the totality of what Dr. Cohen did should be available.

11   That is not available to us in this case, Your Honor.

12                So this really represents in our view an example

13   of where the gatekeeping function is appropriate.  There is

14   simply nothing to test the reliability of Dr. Reinman as

15   opinions on these three references.  Thank you, Judge.

16                THE COURT:  Okay.  Thank you.  Defendants, it is

17   your turn to pick a motion, if you want.

18                MR. DONLON:  Your Honor, the motion on the

19   exclusion of Mr. Weingust as a damages expert.

20                THE COURT:  Okay.

21                MR. DONLON:  Your Honor, following the briefing

22   in this case, as Your Honor is well aware, you issued your

23   September 18th ruling saying that Mr. Weingust could not

24   rely on the Entire Market Value Rule because he had not met

25   the requirements.

1          Mr. Weingust testified in this case exactly the

2    same.  (A), that he used the same approach.  (B), that he

3    did not apportion the value in this case.  And (C), that

4    Awareness products have nonpatented features that add value.

5          Your ruling on the 18th points out that he never

6    conducted a market survey or offered proof of customer

7    demand.

8          That is exactly what happened here.  The

9    argument that plaintiffs have made is, well, Mr. Weingust

10   looked at some of these materials in discovery.  Some of the

11   materials that were produced.  But that argument was made

12   with SpectorSoft as well.  And it was, as the plaintiffs

13   there pointed out in language, very similar to language

14   which was on our own brief, that this was insufficient under

15   *Laser Dynamics* that there is a requirement to do something

16   to determine why customers actually are driven to a

17   particular product.

18          THE COURT:  So with no trial date in place,

19   should I give him another chance if I agree with you?

20          MR. DONLON:  No, you shouldn't, Your Honor.  That

21   is because in this case, that is a third bite at the apple.

22          Here is what happened.  Mr. Weingust does his

23   report in our case.  He is deposed and a motion to exclude

24   him is made in SpectorSoft.  It highlights the very flaws

25   that are in his report.  There are weeks before he is

1    deposed in the present case.  Plaintiffs elect not to do any

2    further work, not to do any market surveys, not to proceed.

3            He is deposed in this case.  We do all the

4    briefing in this case.  Your Honor issues your ruling on

5    September 18th where you indicate that, in SpectorSoft,

6    Mr. Weingust can file a supplemental report.  That was five

7    months ago.

8            Plaintiffs did not request -- having been

9    demonstrated not only the flaws earlier in the briefing but

10   now a ruling from Your Honor that this is unacceptable,

11   they don't come to the Court and say, Your Honor, let's do a

12   supplemental in the Awareness case as well.  They submit a

13   brief.  The brief has no additional report.  It couldn't, of

14   course, they had no permission to.  But the brief can't

15   change Mr. Weingust's report.  So what stands before you now

16   is a flawed analysis of EMVR.

17           What they try to do then is say, look, this is

18   some other evidence.  And that evidence, by the way, there is

19   evidence such as the State of Missouri RFP that Mr. Weingust's

20   report doesn't even list as an item he considered.

21           So from that point, Your Honor, there is, it

22   would be a third bite at the apple.  We have to have our

23   expert look at it, spend more time.  There would be further

24   depositions.

25           So there is no dispute, if Your Honor were to

1    exclude Mr. Weingust and say at present his opinion is not

2    reliable but he can file a supplemental report, that doesn't

3    mean he files a supplemental report and walks into court.

4    The burden is on the plaintiffs to demonstrate that he has

5    met the *Daubert* requirement.

6                    THE COURT:  I'm sorry.  Mr. Squire?

7                    MR. SQUIRE:  I would just object on time, Your

8    Honor.  Our calculations, defendants have gone over their

9    allocated time.

10                   THE COURT:  Okay.  I think by our calculations,

11   he has four minutes left but thank you.

12                   MR. SQUIRE:  Thank you, Your Honor.

13                   THE COURT:  You are very close.  Thank you.

14                   MR. DONLON:  Therefore, Your Honor, the -- I'm

15   sorry.

16                   THE COURT:  It's fine.  I think I understand

17   your position.  Why don't we save your four minutes for

18   rebuttal or something else.

19                   MR. DONLON:  Thank you, Your Honor.

20                   THE COURT:  Let's hear from plaintiff on this

21   one.

22                   Good afternoon.

23                   MS. KRAMAN:  Good afternoon, Your Honor.  Pilar

24   Kraman for the plaintiffs.

25                   Before I start, defendants primarily criticize

1    Mr. Weingust's application of the Entire Market Value

2    Rule, but I wanted to point out before I address that one

3    fundamental difference between this case and the SpectorSoft

4    case that defendants ignore, and that is that they have a

5    codefendant -- Awareness has a codefendant RemoteCOM who is

6    also their customer, and the jury will hear testimony from

7    a customer of what motivated their purchase and why they

8    purchased the SONAR product from Awareness.  So that is a

9    fundamental and very important difference.

10              THE COURT:  Is that discussed in Mr. Weingust's

11   report?

12              MS. KRAMAN:  He does discuss RemoteCOM testimony,

13   cites to RemoteCOM testimony.  And while you mention that,

14   I'll bring up that they do make a point in their response to

15   our supplemental brief that there is substantial new evidence

16   that was not considered by Mr. Weingust and that is not

17   entirely accurate.  There were two, essentially two pieces

18   of evidence that were not considered by Mr. Weingust.  That

19   was the transcript of Awareness' Vice President of Business

20   Development, Kristen Habacht, and two depositions that were --

21   two exhibits to the deposition of Michael Osborn.  That is it.

22              All of the other documents and testimony were

23   included in his items considered or cited in his reply report,

24   either by duplicate Bates number or as deposition exhibits.

25   He didn't cite to every document by Bates number.  He might

1    have cited it as a deposition exhibit.  So he did have, and

2    consider, virtually everything that we attached to our

3    supplemental brief.  So it's not substantial new evidence.

4              So regarding the application of the EMVR,

5    defendants are just simply wrong on the law.  And they're

6    wrong about what facts evidence demand in this case.

7    They're wrong on the law essentially in four ways.

8              First, they insist that the only way we can prove

9    customer demand is through a survey.

10             That is just simply not what the law requires.

11   The law only requires evidence of demand.  The Federal

12   Circuit has never established a bright line rule of what

13   evidence is sufficient and that includes no rule that

14   customer surveys are required.  This is consistent with a

15   recent case from the Northern District of Illinois that

16   rejected similar arguments that a patentee must prove

17   demand through customer surveys and similar evidence.

18             Second, the defendants contend that plaintiffs

19   must show that the patented feature is the sole basis for

20   demand.

21             That is also inconsistent with the law.  As Your

22   Honor knows, recently this was addressed in the *Intellectual*

23   *Ventures* case where this Court rejected a jury instruction

24   proposed by defendant that had an overly narrow view of the

25   law that a patent claim must be the sole basis.  Instead,

1     the Court adopted a jury instruction, setting, of course,

2     the correct view of the law that the plaintiff must prove

3     that the patented feature drives demand but not be the sole

4     basis.

5               Essentially what defendants are asking is

6     that plaintiffs have to prove the inverse of what the

7     law requires such that no other feature factors into a

8     customer's purchasing decision, and that is just not what

9     the law requires.

10              Third, Awareness is wrong on the law regarding

11    what they claim to be an improper evidence of demand, sales

12    and marketing type documents.

13              Again, the Federal Circuit has never drawn a

14    bright line rule regarding what evidence is sufficient and

15    similar type of evidence has actually been used to support

16    application of the EMVR.  This Court did the same with 30(b)(6)

17    testimony.  That the patented technology contributes to an

18    increase in sales.  The Northern District of California found

19    that customer demand evidence was evidenced by the ads,

20    articles showing that the patented feature was important to

21    the defendants' ability to compete.

22              It's plaintiffs' position that this supports the

23    fact that sales and marketing type documents are entirely

24    appropriate evidence of demand to support the application of

25    the EMVR.

1              Fourth, the defendants are wrong about what the

2    law requires on apportionment and application of the EMVR.

3              The Federal Circuit's decision from December,

4    *Ericsson v D-Link*, is particularly instructive here because

5    *Ericsson* discussed the *Garretson* case, and it's in our view

6    clarified the Court's jurisprudence on apportionment and

7    application under EMVR.

8              Essentially what the Court said was that

9    basically when you have, when a product has patented and

10   unpatented features, that it's the combination of the rate

11   and the base that must reflect value that is attributed

12   to the infringing features.  That is the requirement of

13   apportionment that is required in every case.  The Court

14   pointed out that apportionment can happen in various ways.

15   One way can be at the rate, one way can be at the base, or

16   a combination of the rate and the base.

17             In this case, apportionment at the base is

18   difficult because of the nature of the technology.  The

19   accused technology is software.  It is not a multicomponent

20   product like a computer, it's software.  And the plaintiffs'

21   technical expert Dr. Nettles will testify that the essence

22   of this software is the patented technology, the remote

23   monitoring functionality.  So the patented and unpatented

24   features are intertwined such that it's not a single feature

25   that can be pointed to.  It's the entire product that makes

1    use of this remote monitoring functionality.

2           Just as a quick reminder, you heard earlier that

3    the patented technology covers remote monitoring at a user

4    endpoint and centralized management and administration, and

5    this was an improvement over the old way of user monitoring

6    that focused on monitoring at the server or having to

7    physically access a client's computer.

8           So Mr. Weingust apportioned at the rate which

9    *Ericsson* tells us is entirely appropriate, and he testified

10   clearly that this is exactly what he did.  He testified,

11   "my assignment in this case was to determine a reasonable

12   royalty rate for the patents-in-suit.  I've only

13   specifically determined a reasonable royalty rate for the

14   patents-in-suit and for no other aspects of the products.

15   That was not part of my assignment."

16          So he apportioned at the rate.  He did so by

17   undertaking a very thorough *Georgia-Pacific* analysis that

18   is reflected over 34 pages of his expert report.  And he

19   conducted a market study where he reviewed, we detailed in

20   our briefs the kinds of documents he reviewed, dozens of

21   unique sources of information.  He came to a conclusion on a

22   rate, and that is where he apportioned.

23          He testified, and it's in his report, he

24   considered unpatented features of the products.  He also

25   considered other aspects that he credited to Awareness such

1     as their access to capital, their online advertising, things

2     of that nature, that are not covered by the patents-in-suit.

3            Now, in *Ericsson*, the Court explained that

4     if you use a base that attributes the entire value of

5     the product to the patented technology, then there is an

6     additional evidentiary principle that is added to help the

7     jury properly apportion, and that is where the EMVR comes

8     into play.  So the plaintiffs have to show, as we discussed

9     earlier, that the patented feature drives demand for the

10    entire product.

11           Defendants claim that there is just not

12    evidence.  There is not evidence in the record to show that

13    the patented technology drives demand.  And we believe our

14    supplemental briefing ends that argument.  There is tons

15    of evidence in the record that shows that the patented

16    technology drives demand.

17           The record contains testimony from Awareness

18    about what it views are its key features that drive sales,

19    testimony from customers including defendant RemoteCOM about

20    what motivated their purchase, documents from Awareness, and

21    documents from customers that show the patented technology

22    was key to the purchase of the products or, to Awareness,

23    was key to driving sales and to their competitive positioning.

24           So specifically regarding the testimony that

25    is in the record, Brad Miller, who is the CEO, as well as

1    Kristen Habacht, Awareness Vice President of Business

2    Development, they testified that remote monitoring was a key

3    feature to the accused products, and, in fact, that sales

4    would decrease without the ability to remotely monitor.

5              And Mr. Miller also testified that Awareness'

6    advertisements reflect in his view and Awareness' view the

7    features most important to customer.  In one second we'll

8    look at a couple of those advertisements.

9              And Mr. Osborn testified.  He testified shortly

10   before Mr. Weingust's reply report.  That is why his

11   deposition transcript could not be attached to his opening.

12   But Mr. Weingust did refer to Osborn's rough transcript in

13   his reply report.  But he testified that the core of what

14   they were trying to do.  Michael Osborn was a cofounder of

15   the company and developer of the product.  And the core what

16   they were trying to do is remote monitoring and centralized

17   administration.

18             So let's look at a few documents.

19             So these are advertisements from Awareness from

20   the 2006-2007 time frame from when WebWatcher was launched

21   and SONAR was being developed.  And you can see here for

22   both the employer, the enterprise market on the left and

23   the consumer market on the right, Awareness touts that the

24   first feature of the product that they tout is that you

25   can monitor Internet usage from anywhere.  So the remote

1    monitoring functionality is the key feature here that they're

2    listing first as what they can do that no one else can.

3              So another document here that I have is, this

4    is a letter that Awareness produced that was intended to

5    attract affiliate marketers, attract the potential marketers

6    offering them financial motivations to drive sales.  In this

7    document, they indicate that Awareness had a unique financial

8    opportunity to market WebWatcher because WebWatcher could do

9    something that no one else can.  And what is that thing they

10   could do is monitor remotely.

11             Here, it talks about, this is scalability,

12   remote monitoring, centralized management, administration.

13   These are all functionalities that are only available to

14   Awareness because of the patented technology.

15             Likewise, Awareness put together this company

16   overview to attract investors.  In this presentation,

17   they similarly touted the same features.  The ability for

18   Awareness to do things that is enabled by the patented

19   technology that is superior over the old way.

20             Again, throughout the presentation, they

21   highlight their ability to solve problems and meet the demand

22   by doing monitoring the way that it is enabled by the patented

23   technology over and above the old way of monitoring that we

24   discussed a few moments ago.

25             And this slide is important, too, because again

```
 1    they say the same thing.  They can do things the new way

 2    over the old way, but an important thing to note is what

 3    Mr. Squire talked about earlier.  This new way, making

 4    all of its own decisions locally at the desktop, that is

 5    essentially what Pearl Echo does, and this old way, as it

 6    is described here making decisions at the server, that is

 7    Cyber Snoop.  That is exactly what Cyber Snoop did.  So it

 8    shows here, too, the advancements that the new technology

 9    had over the old.

10              Awareness also discusses value compositions that

11    again describe the remote monitoring, the flexibility, the

12    scalability, the centralized management and administration

13    side that is enabled by the patented technology.

14              But all of these things could not be available

15    without the patents-in-suit.

16              So I mentioned that there is ample customer

17    evidence in this case, and, most importantly, RemoteCOM.

18    RemoteCOM will testify that the accused products as well

19    as SpectorSoft products were the only products that it was

20    aware of that could provide the remote user monitoring that

21    it needed, and that was its number one determination when it

22    was looking for a product was the remote user monitoring

23    functionality.  And it was aware of no other company that

24    did that.

25              RemoteCOM did testify that they considered
```

1    proxy-based solutions, which is the old way, one of the old

2    ways of doing things, but it didn't meet the needs of remote

3    user monitoring.

4           Likewise, there is testimony that the jury

5    will hear from Allstate Insurance, they needed a product to

6    remotely monitor users from a central location over, they

7    have employees in offices, various spread out offices and

8    the only products that they found to meet that need were

9    Awareness' products and SpectorSoft's.

10          There is also customer documents in the

11   record that indicate that not only was the real-time remote

12   monitoring a key component for their need for monitoring

13   solution, but it was the number one reason.  The number one

14   feature they were looking for in a product.

15          So this is a request for proposals from Bexar

16   County, Texas which is essentially San Antonio.  In this

17   proposal, they request a solution for remote monitoring

18   so that officers could view defendant data from any computer

19   connected to the Internet, and RemoteCOM responded to the

20   proposal.

21          As Mr. Connor mentioned, or Mr. Squire,

22   RemoteCOM uses Awareness' SONAR product.  They responded

23   here that they are able to provide a product that provides

24   the near real-time monitoring and that their unique

25   client-based architecture provides the ability to do that:

1    the endpoint monitoring and the control software.  Again,

2    this is the new way enabled by the patented technology.

3            They also provided a response.  They filled out

4    this product functionality table that Bexar County required,

5    and you can see here that the number one requirement for

6    the product is the real-time remote monitoring.  Awareness

7    provided input for RemoteCOM completing this product

8    functionality table.  And you can see here that RemoteCOM

9    responded that their product is fully functional and fully

10   able to provide the remote monitoring that Bexar County

11   needed.

12           Likewise, the State of Missouri, a similar

13   "request for" proposal where they were looking for, their

14   number one requirement for a product was the ability to

15   provide real-time remote monitoring service of Internet

16   activity, similar functions to the monitor defendants

17   computer usage.  And RemoteCOM responds that they are able

18   to provide -- that officers could view data remotely from

19   any location and in real-time through unlimited access

20   through a secure user interface.

21           So, in short, it's plaintiffs view that the law

22   supports Weingust's analysis to be apportioned at the rate

23   considering the unpatented features.  He applied the Entire

24   Market Value Rule appropriately to the use of the base, and

25   there is ample evidence in the record to support that it is

1  the patented feature that drives demand for the entire product.

2          THE COURT:  How much of the evidence that you

3  think supports that does Mr. Weingust at least indicate he

4  looked at?

5          MS. KRAMAN:  Quite a bit of it, actually.  The

6  testimony of the key players, of RemoteCOM and Awareness,

7  the RFPs, the Bexar County proposal.  I believe the Bexar

8  County RFP and the Awareness company overview are not only

9  just in his items considered but he actually discusses them

10  in the paragraphs of his report.

11          THE COURT:  Your view is that there has to be

12  apportionment.  You accept that; correct?

13          MS. KRAMAN:  We accept that you have to consider

14  that, right.  That apportionment is required, and that is

15  exactly what he did.

16          THE COURT:  But in an appropriate case, you can

17  do it at the rate or at the base.  You don't always have to

18  do it at both.  That's your view?

19          MS. KRAMAN:  Correct.  Right.  According to

20  *Ericsson*, it makes clear that an economist can apportion at

21  the rate or the base or a combination of both.

22          THE COURT:  Okay.  Thank you.

23          MS. KRAMAN:  Thank you.

24          THE COURT:  You have ten minutes left on the

25  plaintiffs' side, but we'll first see if defendants want to

1    use any of their four minutes on Mr. Weingust.

2                MS. KRAMAN:  Thank you.

3                MR. DONLON:  With that in mind, Your Honor, I

4    have four points, not in rebuttal.

5                No. 1.  Regardless of the EMVR, you have to have

6    a new *Daubert* consideration because in your September ruling

7    in SpectorSoft, you didn't consider the other bases.  There

8    are other bases to reject Mr. Weingust's testimony.

9                No. 2.  Particularly, that his use of the

10   *Georgia-Pacific* factors can't be replicated and therefore

11   it is not reliable methodology.

12               No. 3.  The reference to RemoteCOM as a

13   customer.  As just showed up on the screen, the customers

14   that Remote.com went to wanted real-time remote monitoring,

15   and throughout Mr. Weingust's report, he said what was

16   really important about these was that it was real-time and

17   remote monitoring.

18               Now, real-time went out because the '571

19   patent has been removed from the case.  Now we're focused on

20   remote monitoring.  But, in fact, Mr. Weingust's own report

21   demonstrates that one of the main things that drove customer

22   demand is a non-patented feature for near real-time.

23               Bexar County has that.  Missouri has that.  The

24   testimony from Mr. Arcane of Allstate was we want to know

25   what they're doing while they're doing it.  That's really

```
1    the most important thing.
2            Next.  As to customer demand, their position
3    that you don't need a survey because you can demonstrate
4    it's valuable or even essential.  *Laser Dynamics* rejects
5    that.  It says it doesn't matter that it's valuable or even
6    that it would be commercially untenable without it.  You
7    must show that this is what drives the customer demand.
8            As to whether that must be the sole, and their
9    point that, well, it doesn't have to be the sole method, I
10   call Your Honor's attention to *Ericsson*, the case they have
11   been citing, where the Court explained that the royalty rate
12   must reflect the values attributable to the infringing
13   product, features of the product, and no more.
14           They continue at the end of the same paragraph:
15   It is only the patented technology and so the value to be
16   measured is only the value of the infringing features of the
17   accused product.
18           No apportionment occurred in this case, Your
19   Honor.  It is the testimony of Mr. Weingust, as it was his
20   concession in SpectorSoft, that he did not apportion.  That
21   he simply looked at the patented features.  Because they
22   were new features, they drove demand.  He determined that is
23   what drove demand.  He didn't look at any of this evidence
24   to consider that is what drove demand.  No.  He decided
25   that, in the very language your opinion quotes and rejects,
```

1    that because these were new patented features, that must

2    have been what drove demand.

3                    THE COURT:  So he doesn't contend that he

4    apportioned at the rate.

5                    MR. DONLON:  He does not contend that he

6    apportioned.  There was a statement out of context, but his

7    statement cited in our brief repeatedly says, his testimony

8    in deposition says I did not apportion.

9                    THE COURT:  Okay.

10                   MR. DONLON:  Are there any other questions, Your

11   Honor?

12                   THE COURT:  No, thank you.

13                   MR. DONLON:  Thank you, Your Honor.

14                   THE COURT:  Defendants are out of time.

15                   Do the plaintiffs want to rebut or use their ten

16   minutes on the other motions?  You are free to do so.

17                   MS. KRAMAN:  Thank you, Your Honor.  I'll say

18   one thing about Weingust, and he did testify that he didn't

19   apportion at the base.

20                   THE COURT:  But you think the fair reading of

21   his overall testimony is that he did apportion.

22                   MS. KRAMAN:  At the rate.  Correct.

23                   THE COURT:  And if I disagree with all that and

24   I think we have the same problem or a similar problem to

25   what we have in the related case, address why you should get

1    a third bite at the apple, if that is in fact how I should

2    view it.

3              MS. KRAMAN:  I don't view it necessarily as a

4    third bite at the apple.  I view it as really the same

5    situation.  If you don't think the evidence is sufficient

6    here, we can supplement just like we did in the SpectorSoft

7    case.

8              I'm not quite understanding what third bite of

9    the apple is.  I mean, yes, we did get a supplemental brief

10   but we have never gotten a second expert report.  So I'm not

11   sure what the third bite of the apple is, but for all the

12   same reasons you found it appropriate to do so in the

13   SpectorSoft case, I find it appropriate here, too.

14             THE COURT:  Okay, thank you.

15             MS. KRAMAN:  Thank you, Your Honor.

16             Plaintiffs make two primary arguments in support

17   of their motion to exclude Awareness' and RemoteCOM's damages

18   expert, Mr. Grant.  Everything is fully fleshed out in the

19   briefs but I want to briefly highlight our two main arguments

20   that are based on the same premise, that Mr. Grant's opinions

21   are simply inadmissible as a matter of law.

22             The errors throughout his report are very serious.

23   They're so grave that permitting his testimony would in fact

24   introduce error into the judicial process.  And, honestly,

25   plaintiffs were surprised by the seriousness of the errors

1    and the misapplication of the law and any acceptability

2    methodology in calculating damages.

3              But at his deposition, it did become clearer to

4    us how this could happen when, in response to my questioning,

5    Mr. Grant testified that he at one point thought about

6    terminating the engagement in this case, and he did so because

7    he described Mr. Miller as controlling, and then he also

8    testified throughout his deposition that Mr. Miller was a

9    primary conduit of information in support of his opinions.  So

10   that seemed to indicate to us a reason of why these errors

11   could occur.

12             So to discuss the specific legal errors, there

13   are two:  the first regarding the lump sum opinion, and then

14   Mr. Grant's running royalty calculation.

15             So regarding the lump sum, rather than focusing

16   on calculating damages to the plaintiffs for defendants'

17   infringement, which was Mr. Grant's job because he put forth

18   an affirmative damages opinion, instead he capped damages

19   at what Awareness believes it would cost to design-around

20   the patents-in-suit, which is the $1,000 to $28,000 that it

21   believes it would cost to design-around, and then he added

22   an additional factor which he calls an nuisance factor that

23   Awareness may have given some value to avoid litigation.

24             So his opinion essentially is that a lump sum

25   would be appropriate in this case between $20,000 to $40,000

1    because Awareness would never have agreed to pay more that

2    than because of the cost of design-around.

3            But an opinion like this has been expressly

4    rejected by the Federal Circuit.  That essentially reasonable

5    royalty damages should never, as a matter of law, be capped

6    at what an infringer could have paid to avoid infringement.

7    That makes sense considering that the law is fairly clear

8    that what an infringer would prefer to pay is not a test for

9    damages as the *Rite-Hite* case tells us.

10           Now, the legal record in this case, it was

11   unsurprising to us that Mr. Grant would make this mistake as

12   far as basing his opinion upon what Awareness would prefer

13   to pay rather than compensating the claim for infringement.

14           When we discovered at his deposition that

15   Mr. Grant was operating under an assumption that defendants

16   did not infringe the patents-in-suit, one such example is,

17   this is an excerpt from his deposition.

18           When I asked him:  Why would you ask Dr. Reinman

19   if the accused products actually practice the patent-in-suit?

20           His response was:  Because if they don't

21   practice the patents-in-suit, that seems to erode any value

22   that might be associated with licensing the patents.  Why

23   would I license patents that I don't use or don't need or

24   allegedly convey features or benefits that any customers

25   don't care about.

1           THE COURT:  You have five minutes.

2           MS. KRAMAN:   Okay.  Mr. Grant testified over

3    and over again that the appropriate damages award would be

4    the amount that Awareness would be willing to pay because

5    Awareness, whether you believe defendants that he talked

6    about what they need to do versus what they do, what they

7    actually do, it's a difference that has no relevance here.

8           He testified repeatedly that his damages were

9    based on what Awareness wanted to pay or would pay, not what

10   would compensate the plaintiff for infringement.  And that

11   is legally erroneous, and Mr. Grant should not be permitted

12   to testify about that opinion.

13          More importantly, his opinion can't possibly

14   be helpful to the jury because the jury will only consider

15   his opinion once they find that defendants are liable for

16   infringement.  And since he did not calculate damages based

17   on compensation for infringement, then his opinion could

18   never be helpful to the jury and, in fact, would confuse

19   the jury as to what would be the appropriate compensation

20   for infringement.

21          The second error that plaintiffs point out in

22   their briefs is Mr. Grant's legally erroneous calculation of

23   a running royalty.

24          Mr. Grant agreed at his deposition, and defendants

25   appear to agree, that the running royalty calculation that

1    Mr. Grant did, it would not be an appropriate method to

2    actually calculate a running royalty in this case.  We'll see

3    testimony momentarily where Grant explained that he believed

4    that his methodology would be inappropriate in that context.

5          He did explain that a lump sum payment was

6    appropriate but he didn't run a running royalty.  You can

7    see here he says if you examine the question of compensation

8    from the standpoint of a running royalty, then he says that

9    it confirms his lump sum opinion.

10          So he ran a running royalty scenario to

11   allegedly confirm that his lump sum damages were in the

12   ballpark, but the running royalty was not used, the running

13   royalty was not the result of any acceptable methodology.

14   Defendants insist that this isn't a running royalty analysis

15   but it looks like it, and that is the problem.  It looks

16   like it and can cause serious error and confusion to the jury.

17          So Grant admitted that he did not calculate a

18   royalty rate but he only inserted an assumption of a royalty.

19   Frankly, standing here, it's not clear to us what that

20   means.  He wasn't clear at his deposition.  But he, rather

21   than calculating a rate of one percent, he arbitrarily

22   selected one percent that he just called an assumption of a

23   royalty.  And when asked how did he come up with it, he just

24   repeatedly said that he was not offering an opinion that one

25   percent is the rate he would have selected had he chosen to

1    measure damages using a running royalty.  So he admitted

2    freely that he didn't calculate this properly using the

3    *Georgia-Pacific* analysis or some other kind of analysis to

4    derive a royalty.

5              THE COURT:  So even as a reasonableness check,

6    he has got to follow the proper procedure for reasonable

7    royalty.

8              MS. KRAMAN:  Correct, because he would testify and

9    say, see, I did this reasonable royalty analysis, which you

10   are going to hear from Weingust about a royalty analysis,

11   and he is going to tell the jury I did this other analysis

12   to confirm my $40,000 so the jury can possibly think that the

13   $20,000 to $40,000 is appropriate because it's confirmed by

14   another analysis.  But that analysis was legally erroneous.

15             He also used a base that has no tie to the

16   facts in this case, which he admitted as much.  Instead of

17   defendants' sales as a base, he used estimates of Pearl's

18   sales, not even Pearl's actual sales but estimates of

19   Pearl's sales that he extrapolated out over the period of

20   infringement.  He admitted that the reasonableness check is

21   not a method for calculating royalties, and he admitted that

22   it would be inappropriate for the Court or the jury to

23   actually use his base if he determined that a reasonable

24   royalty was an appropriate measure for damages.

25             THE COURT:  I believe you are out of time.

1          MS. KRAMAN:  Thank you, Your Honor.

2          THE COURT:  So both sides are at this point.

3          Mr. Moran.

4          MR. MORAN:  Just one housekeeping matter.

5          THE COURT:  Okay.  That's fine.

6          MR. MORAN:  I won't argue.

7          THE COURT:  Fair enough.  Go ahead.

8          MR. MORAN:  We were before Your Honor on a

9    telephone conference call on the design-around issue.

10          THE COURT:  Right.  I recall that.

11          MR. MORAN:  You outlined potential options of

12    dealing with that.  I just want to let you know that the

13    defendants preference would be for Option 1, which is the

14    idea of limiting the trial in this case to the version of

15    the products prior to the design-around and limiting the

16    evidence at trial of the actual costs of the design-around

17    and just deal with the projected or estimated costs inasmuch

18    as that would avoid the prospect of additional discovery and

19    the potential for the shifting of those costs.

20          So given that, we're prepared, if Your Honor is

21    amenable to that, to withdrawing our objection to the motion

22    to strike that evidence and just going with Option 1.

23          THE COURT:  Essentially I think I would then

24    be granting the motion to strike?  Is that it conceptually?

25          MR. MORAN:  Conceptually, that would be correct,

1    Your Honor.

2              THE COURT:  Okay.

3              MR. MORAN:  We'll do it that way.

4              THE COURT:  By "okay," let me confirm that

5    plaintiffs are okay with that.

6              MR. CONNOR:  I think we are.  It sounds like you

7    are going to grant the motion to strike.

8              THE COURT:  So let's do that.  It sounds like

9    that.  And unlike a lot of other things, I actually do

10   recall that argument from a couple weeks ago and was going

11   to ask you sort of where we are on that.

12             But how about you all just meet and confer, send

13   me a letter tomorrow.  I think you have an agreement that

14   I'm going to just effectively enter an order granting the

15   motion to strike, but in case it's any more complicated than

16   that, you ought to at least talk and get me a letter.

17             MR. MORAN:  Well, if it is consistent with the

18   discussions, the transcript, the implications of that.

19             THE COURT:  Exactly.  Let me make clear hopefully

20   on your behalf that you're not abandoning anything that you

21   argued earlier, you're reacting to the comments I made at

22   the end of the call which indicated I pretty much narrowed

23   it down to those two options, and in that regard you have a

24   preference for one of those two options.  Neither of them was

25   your original position, I recognize that.  Is that a fair

1    assessment of your position?

2              MR. MORAN:  That's fair.  I think it is

3    consistent with Your Honor's discussion of the implications

4    of that, yes.

5              THE COURT:  Right.

6              MR. MORAN:  On the record.

7              THE COURT:  Okay.  Is there anything you want to

8    talk about?

9              MR. CONNOR:  It's the last part that we'll have

10   to confer about, that we'll submit to Your Honor.

11             THE COURT:  And you will let me know tomorrow if

12   there is any dispute on that.  Otherwise, I will just enter

13   a quick order on that.

14             Are there any housekeeping or other non-argument

15   matters on your side?

16             MR. CONNOR:  Nothing from the plaintiffs.

17             THE COURT:  All right.  We'll take the motions

18   under advisement.  We will be in recess.

19             (Oral argument hearing ends at 4:31 p.m.)

20

21        I hereby certify the foregoing is a true and accurate
     transcript from my stenographic notes in the proceeding.

22

23                            /s/ Brian P. Gaffigan
                              Official Court Reporter
24                            U.S. District Court

25